IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. STEPHEN D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF STEPHEN D., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

STEPHEN D., APPELLANT.

Filed July 15, 2025.    No. A-24-940.

Appeal from the District Court for Lancaster County: RYAN S. POST, Judge. Affirmed.

Eric M. Hagen, of Liberty Law Group, for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

Stephen D. appeals from the order of the Lancaster County District Court that denied his motion to transfer his criminal case to juvenile court. We affirm.

## STATEMENT OF FACTS

Stephen was initially charged in a complaint filed on May 22, 2024, in the Lancaster County Court, with first degree murder, a Class IA felony, and use of a deadly weapon to commit a felony, a Class II felony. The charges arose out of an incident on May 18, in which X.S. was stabbed twice in the chest. The police reports show that Stephen was identified by witnesses as the person who stabbed X.S. Before X.S. died from his wounds, he also identified Stephen as the person who stabbed him. At the first hearing held on May 22, the court found that probable cause for detention existed, and Stephen was placed in the custody of the Lancaster Youth Center. His

- 1 -

bond was set at $750,000. Stephen was subsequently released from custody upon posting a cash bond ($75,000), with certain conditions. Stephen was placed with his maternal grandfather and his wife.

After a probable cause hearing on August 19, 2024, the case was bound over to district court and an information charging the same offenses was filed on September 11. Stephen filed the motion to transfer to juvenile court on October 17. A hearing on the motion was heard over 2 days on October 28 and November 13.

Stephen was 14 years 7 months old at the time of the alleged offenses. He was 15 years old at the time of the hearing. The State presented the testimony of Beverly Hoagland, the Lancaster County chief juvenile probation officer; and Ryan Dvorak, the Lancaster County preadjudication supervisor. Stephen presented the testimony of Erica Schroeder, a licensed independent mental health practitioner; Curtis Thornton, Stephen's maternal grandfather; and Dr. Kirk Newring, a psychologist. Numerous exhibits, including police reports and video recordings, were also received in evidence.

The police reports and related exhibits show that an altercation occurred at a convenience store that initially involved a dispute between Stephen's sister and his girlfriend, and a young female who was with X.S. In addition to Stephen, there were several other youth present. Stephen's sister and girlfriend were sprayed with some sort of chemical agent, and one of them threw a beverage container at X.S.'s vehicle, which caused damage. Stephen, his sister, his girlfriend, and others, then went to Stephen's house. X.S. and his group followed. A video recording of the events at Stephen's house shows a lot of yelling and running around by the females. X.S. exited a vehicle and ran towards Stephen, "squaring up" and throwing a punch at Stephen. It appears that Stephen then swung at X.S. with a knife, X.S. continued to aggress, and Stephen struck X.S. with a knife a second time.

Hoagland testified about the role of juvenile probation and the services available in the rehabilitation of juvenile offenders. According to Hoagland, the main goal of juvenile probation is to work with youth through community-based resources and interventions. She described the different levels of placement options, from placement in the family home up to the most restrictive placement at the Youth Rehabilitation Treatment Center (YRTC). Hoagland testified about the services available through juvenile probation including supervision designed to create positive behavioral changes in adolescents and to enhance community safety. These services include performing a risk assessment and designing a program to reduce the risk of reoffense; skill training; family engagement; case management; and referrals for evaluations, treatment, therapy, and other services.

Hoagland was unaware of any juveniles being supervised in Lancaster County who have been charged with first or second degree murder, although her office has supervised juveniles who have been involved in a crime that resulted in death and juveniles accused of various other violent crimes. Hoagland agreed that there could be barriers to placement outside of the home for youth adjudicated for first or second degree murder, as privately run facilities may deny placement of individuals with aggressive and assaultive behavior. Hoagland did not know whether YRTC has specific programming to treat juvenile offenders who have been adjudicated for murder. She did believe it would be unusual for youths who are between 14 and 16 years old to stay at YRTC until they turn 19.

Hoagland was not familiar with Stephen although she had reviewed the intake report. Based on that intake alone, Hoagland was not in a position to make any recommendations at this time. Hoagland was hesitant to say that all of the services and supervision available through juvenile probation would apply to Stephen because of the offense, however, she agreed that probation would explore all of the options and find the most reasonable program or intervention for Stephen.

Dvorak has worked in the juvenile offender field for many years. Prior to his current position, he worked at YRTC for 5 years, and before that, he was a juvenile probation officer for almost 13 years. He has been in his current position as preadjudication supervisor for over 10 years. Preadjudication services can include electronic monitoring, school tracking, and drug testing. Dvorak had not previously supervised a youth in the preadjudication phase who has been charged with first or second degree murder.

Dvorak had previously supervised Stephen in 2022 when he was on juvenile diversion for the offenses of third degree assault, criminal trespass, and criminal mischief. Stephen was 12 years old at the time of these offenses. Stephen engaged in various services including education courses on conflict resolution and communication strategies, along with community service. Stephen successfully completed this diversion program. In February 2023, Stephen was referred for truancy and he was placed in a truancy diversion program for middle schoolers. He was unsuccessfully discharged in May 2024, due to receiving a new law violation. According to Dvorak, there was an assault referral approximately 15 days before Stephen was detained on the current charges.

Dvorak has been supervising Stephen since May 2024 in connection with the current charges. After being released on bond, services being provided to Stephen included electronic monitoring and drug testing. Initially, Stephen tested positive for marijuana for the first month of Dvorak's supervision but has been testing negative "for a while now." Dvorak agreed that positive marijuana tests can occur for some time after a person stops using it. There have not been any issues with the electronic monitoring. Following Stephen's release from custody in May 2024, Stephen moved in with his grandparents, who have supervised Stephen and supported him in the services provided by probation. Stephen has been engaging in an online school program and participating in therapy. Dvorak testified that Stephen has been "maturing" and while out on bond, Stephen has been cooperating with the conditions of his bond.

Schroeder previously provided therapeutic services to Stephen's family regarding domestic abuse and trauma. In connection with the current charges, Schroeder participated in Stephen's intake and has seen him a total of seven times. Schroeder was provided Newring's evaluation of Stephen prior to beginning his therapy. Schroeder did not review any police reports or evidence relating to the offense but indicated such information was not necessary to develop therapeutic tools to use with Stephen. Schroeder believed that Stephen has experienced trauma within his home, including domestic violence, which could impact the way he processes information and approaches decisionmaking. Stephen has willingly participated in the therapy sessions and has completed the homework Schroeder gave him. Schroeder uses cognitive behavioral therapy and dialectical behavioral therapy with Stephen, designed to assist in changing thinking behaviors and processes, and reactions to certain situations. Schroeder hopes that continued therapy will help Stephen overcome some of the barriers associated with his history of trauma, modify his decision-making processes, assist with emotional and behavioral regulation, and help him become

a safe member of the community. Schroeder believes that it is reasonable to predict that Stephen could attain his therapeutic goals in the next 4 years.

Thornton and his wife have had custody of Stephen since May 2024, which was a family decision in order to more closely supervise him. Thornton monitors Stephen through cameras in the home and tracking his phone. Thornton acknowledged Stephen's previous negative behavior which included being disrespectful, drug use, and issues in school. Thornton testified that these behaviors occurred when Stephen's father was still in the home. According to Thornton, Stephen's father was violent with Stephen and Stephen had little supervision in the home. Since staying with Thornton, Stephen has shown improvement in his maturity and behavior, including being respectful, following rules, and completing school assignments. Thornton believes that Stephen is motivated to take advantage of all services available to him. Thornton and his wife are willing to have Stephen continue living with them until adulthood.

The district court received in evidence a TikTok video, dated October 10, 2024, which showed Stephen, his sister, and another individual, in the basement of Thornton's home. The video shows Stephen vaping and the sister holding a bottle that may have been alcohol. Thornton was not aware that this occurred in his home and indicated he and his wife would have been at work at the time.

Newring testified about his extensive experience in juvenile cases, including those involving juveniles charged with homicide. He testified generally about adolescent brain development and how the frontal lobe, responsible for decisionmaking, is the last to fully develop, generally at around 25 years old. He also testified that children are more vulnerable to the negative influence in their lives due to limited control over their environment. Newring is familiar with the services available through juvenile probation and has completed evaluations at several youth facilities and providers around the state. Newring testified about his familiarity with recidivism rates for juvenile homicide offenders and the variables to consider in predicting recidivism. Factors to consider are the history and background of the juvenile, the circumstances surrounding the offense, the motivation behind the offense, and the context of the occurrence. In the context of violent behavior, one can look at the factors before the violence, the violence itself, and the consequences of the violence, to understand how that behavior occurred and the likelihood of recurrence.

Newring conducted an evaluation of Stephen in July 2024, at the request of Stephen's attorney, for the purpose of aiding the court in considering the motion to transfer the case to juvenile court. Newring began his evaluation with the position advanced by the State; that Stephen intentionally caused the death of the victim by stabbing. As a part of his evaluation of Stephen, Newring interviewed Stephen's mother, grandfather, and Stephen. He reviewed Stephen's family and school history, as well as Stephen's prior juvenile court history. Newring was advised about Stephen's father's sexual abuse of one of Stephen's sisters and the impact it had on Stephen. Stephen advised Newring of his marijuana use, indicating he used marijuana 3-4 times per week prior to his arrest. Newring reviewed information from the preliminary hearing which included testimony from a police investigator about the event. Stephen underwent numerous testing assessments. Ultimately, Newring diagnosed Stephen with adjustment disorder with anxiety and depression; oppositional defiant disorder, adolescent onset; "[r]ule [o]ut [c]annabis [u]se [d]isorder;" and "[r]ule [o]ut ADHD, [c]ombined [t]ype, [a]dolescent [o]nset."

- 4 -

Regarding a potential transfer of Stephen's case to juvenile court, Newring indicated in his evaluation report that Stephen appears to be a suitable candidate for outpatient behavioral health services designed to develop skills in the areas of emotional regulation, interpersonal effectiveness, and distress tolerance. Newring noted that "to his credit, [Stephen] has started counseling." Newring acknowledged that Stephen's alleged action in using a knife included violence but indicated that Stephen's behaviors appeared to be reactionary to X.S. having followed Stephen to his home and his showing a readiness to engage in physical violence toward Stephen. Newring stated that it would be in Stephen's best interests to remain under the supervision of the juvenile court, especially since his brain physiology and personality is not fully developed and given the negative repercussions of a felony conviction. Following the risk assessment testing, Newring stated that Stephen's risk for future acts of violence can be safely managed in the community, by making use of the support and accountability that is available through the juvenile court. Newring indicated that Stephen has learned a greater appreciation for the nature and seriousness of his conduct. Newring believed that since Stephen was satisfying the conditions of his community release (such as continuing with his coursework), was in counseling, and appears safely managed, "the security of the public appears suitabl[y] managed, vis-à-vis [Stephen's] community placement."

Newring testified at the transfer hearing that he had reviewed audio and video files, paper documentation, school records, and other materials that have become available over the course of the case. Specifically, prior to the hearing, he was able to review the discovery that the State provided to the defense, which was not available at the time he conducted his evaluation in July 2024. He also was present to hear the testimony of the previous witnesses.

Newring testified that Stephen appears to be doing better academically since the case began, he has had fewer conflicts, and he has had negative UA's; all of which showed a trend towards a response to supervision. Newring testified that in his opinion, Stephen presents as having a low risk of future acts of homicidal violence as was seen in this case. He also opined that if similar circumstances occurred as in this case, Stephen would "more likely take a beating than respond violently after his experience in this matter." Newring indicated his belief that Stephen did not fully appreciate at the time of the offense the damage a bladed instrument could do and that he has learned from his behavior, which led to the death of one of his friends from elementary school. In reaching this conclusion, Newring considered the context of the occurrence, which began with the behavior of others and resulted in Stephen feeling at risk of violence from others.

Newring agreed that the therapeutic tools being used by Schroeder were appropriate and could result in improved decisionmaking for Stephen. Newring ultimately opined that Stephen is amenable to the services and treatment available through the juvenile court and that those services that can be provided to him in the community are sufficient for Stephen's needs. Newring also believed that Stephen could be rehabilitated by the time he reaches the age of 19. Newring affirmed that even after reviewing the additional discovery materials provided to him after the completion of his evaluation, his opinions remained the same, except for adding the recommendation that contact between Stephen and his sister be supervised.

During the transfer hearing, the State moved to revoke Stephen's bond, based upon the October 2024 video evidence while Stephen was in his grandfather's basement, showing Stephen's

continued violations and lack of supervision. The court granted the motion and set a new bond amount. Our record does not indicate where Stephen was placed after this.

On December 6, 2024, the district court entered an order denying the motion to transfer the case to juvenile court. After setting forth the statutory framework, the court analyzed each of the factors.

As summarized, the court found that Stephen was not amenable to participating in treatment and found this factor weighed in favor of retaining the case. The court noted Stephen's past interactions with the juvenile court system, his continued aggressive tendencies, and his poor school attendance. The court referenced Newring's opinion that Stephen is in need of behavioral health services, however, the court placed little weight on this opinion as Newring had only conducted a records review before any discovery had been done. Similarly, the court discounted the testimony of Schroeder, as she had not viewed the police reports or other evidence relating to the underlying incident. Finally, the court noted the testimony of Hoagland, who indicated that while a number of programs are available through juvenile probation, the nature of the charge may prevent acceptance into some programs.

The court found the following factors also weighed in favor of retaining the case: the violence involved in the alleged offense, the apparent motivation (possible retaliation), Stephen's history of acting violent towards other people and property (two referrals for assault the month prior to this incident), the consideration of public safety, Stephen's ability to appreciate the nature and seriousness of his conduct (admitting stabbing victim and attempt to conceal the crime), the best interests of the juvenile and security of the public may require secure detention or supervision extending beyond his minority, the victim's family will not agree to participate in restorative justice, and Stephen is not eligible for a pretrial diversion program.

The district court found that the following factors weighed in favor of transferring the case to juvenile court: Stephen's age, the best interests of Stephen (avoiding felony conviction and possible life imprisonment), Stephen had no prior convictions for use or possession of a firearm, no court order has been issued for Stephen pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016), and he is not officially associated or known to be associated with any gang.

The district court concluded that the State met its burden of establishing a sound basis for retaining the case in district court and denied the motion to transfer.

Stephen appeals.

## ASSIGNMENTS OF ERROR

Combined and restated, Stephen assigns that the district court abused its discretion in denying Stephen's motion to transfer to juvenile court where the State failed to show a sound basis existed for retention in district court, and in finding that statutory factors favored retention of the case in district court.

## STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023). An abuse of discretion occurs when a trial court's decision is based upon reasons that

- 6 -

are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IC, ID, II, or IIA felony. Actions against such juveniles may be initiated either in juvenile court or in the county or district court. Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2024). Stephen was 14 years old at the time of the offense and the charged Class IA and II felonies place Stephen in the second category of juvenile offenders. The State elected to file charges against Stephen in the district court. When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party may move to transfer the matter. See *id.*

Section 29-1816(3)(a) requires consideration of the following factors set forth in Neb. Rev. Stat. § 43-276(1) (Cum. Supp. 2024):

> (a) The type of treatment such juvenile would most likely be amendable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim of juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

After considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county or district court. § 29-1816(3)(a).

"[F]actors that are considered 'neutral' or 'not applicable' are equivalent to factors that favor transfer because § 43-276 starts with the presumption that the case should be transferred." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). The classification of certain factors as "neutral," "not applicable," or "weighing in favor of transfer" are better described as factors that do not support a sound basis for retention. See *id*.

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public

protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id*. "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id*. "[T]he burden of proving a sound basis for retention lies with the State." *Id*. at 557, 990 N.W.2d at 926.

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

The Nebraska Supreme Court recently addressed the abuse of discretion standard in juvenile transfer cases in *In re Interest of Jeremiah T.*, 319 Neb. 133, 151-52, 21 N.W.3d 313, 327 (2025):

> Abuse of discretion is a highly deferential standard of review. It is the standard applicable to reviewing a criminal sentence, where we have explained that "[i]t is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate" and that "[t]he standard is not what sentence we would have imposed." Likewise, in reviewing a trial court's ruling on a transfer motion, an appellate court's function is not to review the record de novo to determine whether we think the case should be transferred.

In *In re Interest of Jeremiah T.*, this court reversed the district court's denial of Jeremiah's motion to transfer the case to the juvenile court. The Supreme Court in turn reversed our decision, finding that our analysis of the evidence essentially amounted to a de novo review in that we articulated reasons why we would have transferred the matter to juvenile court. The Supreme Court stated that we were "not empowered to second-guess the district court's assessment" of the evidence. *Id*. at 151, 21 N.W.3d at 327. The court concluded that the district court did not abuse its discretion in overruling Jeremiah's motion to transfer the matter to juvenile court.

Given this backdrop, we now turn to analysis of the evidence relating to the foregoing statutory factors.

JUVENILE AMENABLE TO TREATMENT

Section 43-276(1)(a) requires the court to determine the type of treatment the juvenile would most likely be amenable to. As noted above, the district court found that Stephen was not amenable to participating in treatment and found this factor weighed in favor of retaining the case. The court noted Stephen's past interactions with the juvenile court system, his continued aggressive tendencies, and his poor school attendance. The court placed little weight on Newring's opinion, finding that he had only conducted a records review before any discovery had been done. Similarly, the court discounted the testimony of Schroeder, as she had not viewed the police reports or other evidence relating to the underlying incident. Finally, the court found that Hoagland's testimony indicated that while several programs are available, the nature of the charge may prevent acceptance into some programs.

Stephen asserts that the district court's findings regarding this factor were erroneous. He points to Newring's testimony that he reviewed the bulk of the discovery (except the duplicative materials), including the exhibits offered at the hearing. In addition to completing an evaluation of

Stephen, Newring was present for all of the testimony given during the transfer hearing. Newring testified about his familiarity with the services offered in the juvenile court system, and he indicated that the services are not crime-specific such that they would be available for Stephen based on his individual assessment. Newring opined that the services that can be provided through the juvenile court and juvenile probation would meet Stephen's needs. Newring pointed to Stephen's maturation and increased insight since being provided services to date, confirming that he is amenable to treatment.

Stephen also asserts that the district court's findings regarding Schroeder were erroneous as Schroeder was very familiar with Stephen and his family, having worked with them prior to the instant case. She testified to the progress that Stephen was making in therapy and about the likelihood that continued treatment would be successful in rehabilitating Stephen before reaching the age of majority.

Stephen further argues that although the district court noted Hoagland's testimony that the charges against Stephen might limit the services available to him through the juvenile court, she also indicated that all of the available services would be explored in developing a rehabilitation plan.

The district court placed little weight on Newring's opinion because "his expert opinion was formed before reviewing any discovery in the case, police reports, photos, body worn camera, or other videos." And it discounted Schroeder's testimony on a similar basis. The district court neglected to recognize that Newring affirmed his initial opinions after reviewing the material noted by the court and that Schroeder had prior experience working with Stephen and his family; however, we recognize that a court is not required to accept the opinion of an expert. See *In re Interest of Jeremiah T., supra*. And where, as here, the record contains circumstantial evidence that conflicts with an expert's opinion, the court does not abuse its discretion in relying on that circumstantial evidence in evaluating whether a factor weighs in favor of retaining a juvenile's case. Although Stephen adduced contrary evidence regarding these witnesses' familiarity with both the details of the incident and Stephen's background, we are constrained from substituting our view of the evidence for that of the district court.

The district court relied primarily upon the State's evidence that Stephen has had prior involvement with the juvenile justice system and disciplinary actions at school, yet he continued to engage in aggressive behavior. Under our highly deferential standard of review, we are unable to say that the district abused its discretion in finding that this factor weighed in favor of retention in the district court.

### ALLEGED OFFENSE INCLUDED VIOLENCE

Clearly, the alleged offense included violence, and the district court properly found that this factor weighed in favor of retaining the case in district court.

### MOTIVATION FOR COMMISSION OF OFFENSE

Although the district court found that "it is not entirely clear at this time what [Stephen's] motive may have been," it nevertheless went on to "infer" that the motivation might have been retaliation and found that this factor favored retention. Stephen asserts that the most rational conclusion from the evidence is the motivation of self-defense or defense of others. The evidence

from the preliminary hearing and the video of the incident shows that X.S. ran towards Stephen, "squared up" to him, and threw a punch at Stephen. Stephen's response in swinging at X.S. happened very quickly. While we make no comment on the viability of Stephen's asserted defenses, given the district court's admission that the motivation was not entirely clear from the record, we conclude that this factor is neutral and as such, does not support a sound basis for retention in the district court.

### AGE OF JUVENILE AND OTHERS INVOLVED

Stephen was only 14 years old when the alleged offenses occurred. The victim was 16 years old. There were numerous other juveniles involved in the incident, the ages of which are not entirely clear from the record.

We agree with the district court that this factor does not support a sound basis for retention in the district court.

### PREVIOUS HISTORY OF JUVENILE

Stephen had received juvenile diversion in 2022, for charges of third-degree assault, criminal trespass, and criminal mischief. Stephen was 12 years old at the time of these offenses. He also was referred for truancy, however, that diversion was terminated due to his continued absences from school. There was an additional referral for alleged assaults shortly before the current case. This factor weighs in favor of retaining the case in the district court.

### BEST INTERESTS OF JUVENILE

Given Stephen's young age, his potential rehabilitation, and the avoidance of a felony conviction, we agree with the district court that this factor does not support a sound basis for retention in the district court.

### CONSIDERATIONS OF PUBLIC SAFETY

The charged offenses are clearly serious in nature and certainly Stephen's actions create public safety concerns should this type of behavior reoccur. This factor weighs in favor of retaining the case in district court.

### ABILITY TO APPRECIATE NATURE
### AND SERIOUSNESS OF CONDUCT

The district court found that Stephen appears to appreciate the nature and seriousness of his conduct, and that Newring, Schroeder, and Thornton agreed. We note that Newring's testimony was that Stephen has matured and developed a better understanding of the impact of his actions and the ability of a knife to create significant harm. This supports a finding that Stephen grew to appreciate the seriousness of his conduct but does not speak to whether he appreciated it at the time. As noted by the district court, however, Stephen did immediately take steps to conceal his actions which supports a conclusion that he recognized the nature and seriousness of his acts at the time they were committed. Therefore, we agree that the record contains evidence to support the district court's determination that this factor weighs in favor of retention.

### SECURED DETENTION/SUPERVISION REQUIRED BEYOND MINORITY

The next factor is whether the best interests of the juvenile and the safety of the public require secure detention beyond the juvenile's age of majority. Witnesses testified that Stephen can be rehabilitated, eliminating risk to the public, before reaching the age of majority. Specifically, Schroeder testified that with continued therapy and supervision through the juvenile court, Stephen could reach his therapeutic goals in the next 4 years. Newring testified that with continued therapy and supervision through the juvenile court, Stephen could be rehabilitated by the time he reaches 19 years of age. The State did not provide any contrary testimony.

In assessing this factor, the district noted the possible penalties for the charged felonies, as well as the tools at the court's disposal to tailor an appropriate sentence for Stephen. The court considered the available time for treatment programs, the need for supervision, and the security of the public in finding that Stephen's need for supervision would outlast his minority and jurisdiction of the juvenile court. Given the district court's determination regarding Stephen's amenability to rehabilitation based upon his prior response, or lack thereof, to treatment, under our deferential standard of review, we cannot conclude that the district court abused its discretion in determining this factor weighed in favor of retention.

### VICTIM AMENABLE TO RESTORATIVE JUSTICE

The family of X.S. is not willing to explore restorative justice. This factor weighs in favor of retaining the case in district court.

### EXISTENCE OF JUVENILE PRETRIAL DIVERSION PROGRAM

Juvenile pretrial diversion is not available based upon the nature of the charges. This factor weighs in favor of retaining the case in district court.

### CONVICTION/USE/POSSESSION OF FIREARM

Although there were screen shots in the record showing Stephen holding some type of gun, it was likely not a real firearm. There was no other evidence of a conviction, use, or possession of a firearm by Stephen. We agree with the district court that this factor does not support a sound basis for retention in district court.

### COURT ORDER ISSUED UNDER § 43-2,106.03

The record shows no court order being issued under § 43-2,106.03. This factor does not support a sound basis for retention of the case in district court.

### CRIMINAL STREET GANG MEMBER

The record shows that while Stephen may be familiar with some gang members, there is no evidence that he is a member of any criminal street gang. We agree with the district court that this factor does not support a sound basis for retention of the case in district court.

### SUMMARY OF STATUTORY FACTORS

The district court found that the majority of factors showed a sound basis for retaining the case in the district court. But the decision to retain or transfer a case is based on a balancing test and there are no weighted factors. See *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915

(2023). The ultimate test is a "balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id*. Our review is limited to determining whether the trial court's reasons and rulings are clearly untenable. *In re Jeremiah T., supra*. To be "untenable" is to be "incapable of being defended." *Id*. Given this limitation on our review, we cannot say that the district court's factual findings nor its ultimate refusal to transfer the matter to the juvenile court was clearly untenable. Clearly, the alleged offenses were very serious in nature and resulted in the death of a young person. We are mindful of Stephen's young age and his potential for rehabilitation; factors which can be considered in the district court proceedings. Accordingly, we affirm its denial of Stephen's motion to transfer his case to the juvenile court.

## CONCLUSION

A sound basis exists for retention of Stephen's case in the district court; therefore, we find no abuse of discretion in the district court's denial of his motion to transfer his case to the juvenile court.

AFFIRMED.

- 12 -