Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/06/2025 09:07 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
JEREMIAH T., APPELLANT.
___ N.W.3d ___

Filed June 6, 2025.    No. S-24-815.

1. **Criminal Law: Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** An appellate court reviews a trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court for an abuse of discretion.

2. **Rules of the Supreme Court: Appeal and Error.** If further review is granted, the Nebraska Supreme Court will review only the errors assigned in the petition for further review and discussed in the supporting memorandum brief.

3. **Courts: Juvenile Courts: Jurisdiction: Proof.** In a motion to transfer to juvenile court, the burden of proving a sound basis for retaining jurisdiction in county court or district court lies with the State.

4. **Courts: Juvenile Courts: Jurisdiction: Evidence.** When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court.

5. **Courts: Juvenile Courts: Jurisdiction.** In order to retain proceedings in criminal court, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile.

6. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

7. **Courts: Expert Witnesses.** As the trier of fact, the district court is not required to take the opinions of experts as binding upon it.

8. **Expert Witnesses: Witnesses: Testimony.** Testimony of expert witnesses is not treated any differently in the factfinding process than that of witnesses generally when it comes to determining the weight and credibility of the testimony.
9. **Circumstantial Evidence: Proof.** Circumstantial evidence is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact.
10. **Appeal and Error.** Abuse of discretion is a highly deferential standard of review.

Petition for further review from the Court of Appeals, Pirtle, Bishop, and Arterburn, Judges, on appeal thereto from the District Court for Douglas County, Leigh Ann Retelsdorf, Judge. Judgment of Court of Appeals reversed and remanded with direction.

Jason E. Troia, of Jason Troia Law, for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Cassel, J.

## INTRODUCTION

After the State charged a 15-year-old male with a Class II felony in district court, he moved to transfer the case to juvenile court. The district court overruled the motion, but the Nebraska Court of Appeals reversed, determining that the lower court had abused its discretion. We granted further review. Because the district court did not abuse its discretion, the appellate court erred in concluding otherwise. We reverse, and remand with direction.

## BACKGROUND

For background, we start with a brief procedural history of this case. Then, we discuss the evidence adduced at a hearing on the transfer motion.

## PROCEDURAL HISTORY

This case commenced with the State's filing of an information in district court charging Jeremiah T. with sexual assault in the first degree, a Class II felony. Jeremiah moved to transfer the case to juvenile court.[1] After conducting a hearing on the motion to transfer, the district court overruled the motion.

Jeremiah appealed, pursuant to a statute permitting an interlocutory appeal.[2] The Court of Appeals released a memorandum opinion[3] reversing the district court's decision and remanding the cause with direction to sustain the motion to transfer.

The State filed a petition for further review, which we granted.[4] We expedited both the oral argument of the case and the release of our decision.

## EVIDENCE ON TRANSFER MOTION

During the hearing on the motion to transfer, the district court heard the live testimony of an expert witness and received 14 exhibits. The exhibits were primarily documentary exhibits but also included audio and video recordings. After the hearing, the court received two additional exhibits.

The evidence established that on December 1, 2023, at a high school in Omaha, Nebraska, L.S. reported that she was "sexually assaulted within the school in the last 15 minutes." Video footage from the school showed 14-year-old L.S. in a hallway with Jeremiah and G.G.—both age 15—at approximately 12:40 p.m. The three are then out of the camera's view until 12:50 p.m. At that time, L.S. came out of a stairwell, went into a bathroom for approximately 2 minutes, then walked to her locker. After that, L.S. reported the assault to school officials.

---

[1] See Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2024).

[2] See § 29-1816(4).

[3] *State v. Jeremiah T.*, No. A-24-815, 2025 WL 1165671 (Neb. App. Apr. 22, 2025) (selected for posting to court website).

[4] See Neb. Rev. Stat. § 24-1107 (Reissue 2016).

A couple of hours later, L.S. sat for an interview at a child advocacy center. When asked to explain what happened, L.S. stated that she and Jeremiah had been texting and were going to "'meet up[,] cuz I knew him for a long long time now,'" and were going to "'hang out.'" L.S. and Jeremiah then went into a room at the school "where people would go to chill out and make TikToks so she believed they were just going to 'chill, talk, and you know, not doing nothing important.'" L.S. said that she

> "went into this corner, and [Jeremiah] came up to me and physically moved me out of the corner, made me go in front of him, and then he like started bending me over, and then started basically dry humping me . . . after that he tried taking off my pants and I was like, 'ah were [sic] not doing this at school, and what are you doing? I don't want to do this' . . . and then after that he was like, 'this is what you was talking about [don't] be scared now.'"

L.S. responded that she "'never said I wanted to do this.'"

L.S. stated that Jeremiah then

> "forcibly like ben[t] me over and we started to get on the floor, he basically made me get on the floor, and then he put it in me . . . after that I told him to stop and he didn't listen, and I kept on telling him to stop and he didn't listen . . . I tried to get up . . . I'd say I tried to get up like five times, and he forcibly pinned me down on the floor so I couldn't get up until he was done."

According to L.S., Jeremiah ejaculated on the back of her pants. She said she "looked at him and was like, 'dude are you serious?'" L.S. walked out and then started crying.

The record contains Jeremiah's interview with a law enforcement officer. Jeremiah stated that he had known L.S. for a long time and that she had sent him a text message about "meeting up." Jeremiah stated that when they met, L.S. "started to talk freaky and gave him a hand job." He thought that L.S. said he raped her because he told her that "her hand job was trash." Jeremiah said that L.S. consented to sex and

that she never told him to stop. He said L.S. did not initially want to "do it at school but he told her they wouldn't get caught." Jeremiah later said that "he stopped after [L.S.] said stop one and a half times." He stated that he was "'not trying to make this weird,'" but he was a teenager who "'watch[ed] porn,'" and "'in the porn they be like, "oh stop, stop," . . . and I didn't know she was meaning it in that way,'" so when L.S. said "'I have, you a girlfriend . . . and then she was like stop . . . I didn't realize too till I was done.'"

The record also contains information regarding G.G.'s involvement. According to a summary of G.G.'s interview contained in a supplemental police report, G.G. stated that he could see L.S. and Jeremiah the entire time and that nothing sexual occurred. When asked why he did not help L.S., G.G. said "'she never asked me for help.'" Unprompted, G.G. stated that "'he told me she agreed on it, that she wanted to do it.'" G.G. explained that Jeremiah told him that after it had happened. G.G. said that he did not hear anything because he was wearing "Airpods" and that he did not see anything because "he kept walking up to the door to make sure no one was coming in." But he also stated that he heard "'kissing.'"

L.S. stated that G.G. was "'there for the whole time, he was just sitting on the stairs and he heard me say "stop" and "I didn't wanna do this," and he didn't help me . . . he was just standing there.'" L.S. told the interviewer that she could see G.G. "when this was happening" but that he "was just on his phone." According to L.S., she thought that G.G. knew "it" was going to happen, because Jeremiah "told [G.G.] something, he laughed, and then it happened after that."

Jeremiah said that G.G. was in the room when the incident happened, that G.G. knew what was happening, and that G.G. "heard it all." According to Jeremiah, G.G. was sitting on the stairs making sure that no one entered the room. Jeremiah stated that he told G.G. that L.S. wanted to go in the room and asked G.G. to "'just watch the doors to make sure no one comes in.'"

The court received an affidavit of a juvenile court coordinator with the public defender's office. She opined that the separate juvenile court had services available to Jeremiah, including outpatient treatment specific to sexual offenders, a therapeutic group home for youth that sexually offend, a psychiatric residential treatment facility for youth that sexually offend, or commitment to a youth rehabilitation and treatment center.

The court also received a status report from the Douglas County Youth Center dated September 17, 2024. It showed that Jeremiah had one major rule violation, which was fighting on May 31. The report stated that Jeremiah "has become a role model to his peers on the unit," that he was "respectful to staff and always willing to help around the unit," and that his mother consistently visited him.

Dr. Kari Perez, a clinical and forensic psychologist, assessed Jeremiah's risk for reoffending and considered his risk to the community, his amenability to treatment, and his level of sophistication and maturity as it relates to transfer. In reaching her conclusions, Perez relied on police reports, court documents, video recordings, interviews with Jeremiah and with his mother, and psychological testing and forensic assessments.

Perez spent about 5 hours interviewing Jeremiah. He was age 15 when Perez interviewed him, but he turned 16 years old prior to the hearing. Perez testified that Jeremiah was generally cooperative and forthcoming with information. However, he tried "to present himself in a very positive light," which "became a concern later in the assessment process that was addressed."

Perez spent approximately 2 hours performing psychological testing on Jeremiah. The tests she administered included the Minnesota Multiphasic Personality Inventory for Adolescents (MMPI), the Personality Assessment Inventory for Adolescents (PAI), and the "Conners 4." She also administered forensic tests—the Protective + Risk Observations For Eliminating Sexual Offense Recidivism (PROFESOR) and the Structured Assessment of Violence Risk in Youth (SAVRY).

From the MMPI, Perez learned that Jeremiah "was reporting a lot more virtuous types of behaviors than is typical of somebody his age." That affected the validity of the test, so Perez administered the PAI "to try to get more information." Jeremiah's results on that assessment were considered to be valid. The only "possible issue" on the PAI was that Jeremiah showed "a little less treatment motivation than some of the youth who take the test who aren't engaging in treatment."

The purpose of the PROFESOR test is to identify the intensity of the treatment needed. Perez testified that Jeremiah's treatment intensity was "low to moderate" because the results showed more protective factors than risk factors. She explained that "moderate" treatment intensity might mean something like a therapeutic group home and "low" treatment intensity would be "maybe intensive outpatient" therapy. Risk factors identified were "Sexual Beliefs and Attitudes," "Knowledge of Consequences of Sexual Offending," and "Strategies to Prevent Sexual Offending."

The violent offense risk assessment—SAVRY—provides an estimate of future violence risk. Jeremiah's SAVRY score was low.

Perez testified that the rate of sexual reoffending in adolescents is between 2.5 and 5 percent. She elaborated, "So, if you make a risk prediction with an adolescent and you say that they are low, about 95 percent of the time, you will be correct."

Perez testified that Jeremiah comes from a supportive family environment. His mother is "very engaged" and has maintained a close relationship with Jeremiah. Perez testified that Jeremiah's mother described him as "a good kid that didn't get into trouble at home much."

When Jeremiah was in approximately the ninth grade, he was affected by antisocial behaviors when an older cousin moved into their apartment and engaged in activities such as stealing. Jeremiah said that he did not participate in such activities, because his mother would "kill him" if he did.

Perez testified that when Jeremiah was in the eighth grade, he was identified as having a learning disability in written expression and mathematics. Jeremiah was involved in some disruptions in school, but the school opined that they were due to academic challenges rather than significant behavioral concerns.

With regard to Jeremiah's medical history, Perez testified that there was nothing of significance. Jeremiah did not have a history of trauma or abuse. Nor did he have any psychiatric history.

Perez testified that Jeremiah had no prior juvenile court cases, prior arrests, or prior interaction with the police. He reported experimenting with marijuana on one occasion and stated that he "didn't really like it."

As for what led to the criminal offense, Perez identified two factors: impulse control and misunderstanding what the victim was saying. She further explained that Jeremiah watched pornography which "had shown women who were saying no or stop, and — but it was continuing. And so, he picked up from that that some women . . . enjoy that or that that's okay."

Perez expressed familiarity with Dr. Colleen Conoley and Conoley's research in general. Perez had read Conoley's 2014 deposition testimony from a different case. According to that research, the frontal cortex of an adolescent's brain, which is responsible for making good decisions and delaying gratification, is underdeveloped and continuing to develop until approximately age 25.

Perez opined that Jeremiah was of average maturity for his age. As for cognitive maturity, he displayed some immaturity by not always weighing the consequences before making decisions. Perez did not find anything particularly problematic regarding his maturity. With regard to the transfer evaluation, Perez looked at whether Jeremiah was using that maturity to advance criminal objectives and did not find that he was.

Perez believed that Jeremiah was amenable to treatment. She testified that Jeremiah was asserting that he was innocent,

so that would "provide some complications." She spoke about different interventions that would help Jeremiah and stated that those services are available in juvenile court. Perez testified that the treatment she recommended could be completed before Jeremiah turned 19 years old. She did not believe he created a risk to the community.

Perez also touched on the treatment options if the case remained in adult court and Jeremiah were sent to prison. The options included bibliotherapy, outpatient group therapy, and residential inpatient treatment. Perez believed that Jeremiah would likely get a recommendation for bibliotherapy or for no treatment. Thus, if Jeremiah went to prison, there is a chance he would not be treated. And with respect to services available, Perez testified, "I'm not sure that it would be as beneficial as what he would receive if he was in the juvenile system."

Following the hearing, the court received an exhibit created by a specialized probation officer at the State's request. It described services provided to clients on adult probation and what those services may look like for a juvenile on adult probation. The probation officer stated, "Regarding services for juveniles on adult probation, I am going to focus on those ages 16 and 17 and why this programming may not be appropriate for juveniles." The probation officer explained that a juvenile can attend the programs, but "it becomes a challenge" when the juvenile does not have a support system. Juveniles who participated in the programming reported "feel[ing] out of place and struggl[ing] to connect with others in the group." The officer elaborated, "Juveniles are often still in school and trying to juggle the demands of their adult probation order, work, and manage peer pressure." Although the officer recognized that "Nebraska Probation is ahead of many states when it comes to working with juveniles in the adult court system and offers excellent programming and services," the officer stated: "[I]f a youth can reasonably remain in the juvenile court and on juvenile probation they should. The programming offered by Juvenile Probation is designed for such."

The district court's findings and the Court of Appeals' reasoning will be discussed in the analysis section.

## ASSIGNMENT OF ERROR

The State assigns that the Court of Appeals erred in concluding that the district court abused its discretion in denying Jeremiah's motion to transfer his case to the juvenile court.

## STANDARD OF REVIEW

[1,2] An appellate court reviews a trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court for an abuse of discretion.[5] If further review is granted, the Nebraska Supreme Court will review only the errors assigned in the petition for further review and discussed in the supporting memorandum brief.[6]

## ANALYSIS

### Governing Law

Because Jeremiah was 15 years old when he allegedly committed an offense punishable as a Class II felony, the county court or district court had concurrent original jurisdiction with the juvenile court.[7] Thus, the action could be initiated either in county or district court or in juvenile court. The law also allows transfer of actions filed in an adult court to a juvenile court. It also bears noting that because Jeremiah was under age 18 when he allegedly committed the crime, Neb. Rev. Stat. § 29-2204(5) (Cum. Supp. 2024) provides the district court with the same dispositional options as a juvenile court.

Overlapping statutes specify factors to be considered regarding initial forum selection and transfer decisions. One sets forth criteria that a prosecuting attorney must consider when

---

[5] See *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023).

[6] See, Neb. Ct. R. App. P. § 2-102(G) (rev. 2022); *Corcoran v. Lovercheck*, 256 Neb. 936, 594 N.W.2d 615 (1999).

[7] See § 29-1816(1)(a)(ii) and Neb. Rev. Stat. § 43-246.01(3)(a)(iii) (Cum. Supp. 2024).

"making the determination whether to file a criminal charge" in county court or district court or to "file a juvenile court petition."[8] A transfer provision requires a court making a transfer determination to consider those factors.[9]

The statutory criteria are as follows:

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.[10]

---

[8] Neb. Rev. Stat. § 43-276(1) (Cum. Supp. 2024).

[9] See *id.* See, also, § 29-1816(3)(a).

[10] § 43-276(1).

The transfer statute expresses both a preference in favor of transfer and the basis for not doing so. "After considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court."[11]

[3] Our case law sets forth a burden of proof. In a motion to transfer to juvenile court, the burden of proving a sound basis for retaining jurisdiction in county court or district court lies with the State.[12]

[4,5] We have also explained the relationship between the evidence and the appellate standard of review, and the balancing test to be applied by the adult court. When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court.[13] In order to retain proceedings in criminal court, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile.[14]

[6] Further, with regard to the appellate standard of review, a review for an abuse of discretion differs from a review de novo on the record. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[15] In contrast, in a review de novo on the record, an appellate court is

---

[11]  § 29-1816(3)(a).

[12]  *State v. Aldana Cardenas, supra* note 5.

[13]  *Id.*

[14]  *Id.*

[15]  *Backhaus v. Backhaus*, 318 Neb. 891, 20 N.W.3d 81 (2025); *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018).

required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[16] Here, the Court of Appeals' review was limited to an examination for abuse of discretion.

[7,8] We are also mindful that as the trier of fact, the district court is not required to take the opinions of experts as binding upon it.[17] Testimony of expert witnesses is not treated any differently in the factfinding process than that of witnesses generally when it comes to determining the weight and credibility of the testimony.[18]

### District Court's Findings

The district court overruled Jeremiah's motion to transfer the case to juvenile court. Its order contained the following description of the assault:

L.S. reports that she and [Jeremiah] were in a room together and [Jeremiah] became aggressive. She indicates that a friend of [Jeremiah], G.G.[,] was positioned as a look out to protect the assault from interruption. [Jeremiah] physically forced her to the ground and forced his penis into her vagina and ejaculated. She reported she attempted to scream for the other student without response and that she told [Jeremiah] to stop. She reported that she attempted to get up or away, however, [Jeremiah] forcefully restrained her and pulled her pants down to assault her.

The district court discussed the evidence relative to the transfer factors in § 43-276. With regard to the type of treatment to which Jeremiah would most likely be amenable, the court found that there was "a significant issue as to whether [Jeremiah] can successfully complete appropriate

---

[16] *Backhaus v. Backhaus, supra* note 15.

[17] See *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990).

[18] *In re Interest of T.W.*, 314 Neb. 475, 991 N.W.2d 280 (2023).

rehabilitative treatment in the juvenile court, within the juris-dictional limited time frame of the juvenile court." In con-sideration of whether the offense included violence, the court stated that it "involved significant aggression," including "physical domination, control and violence."

The court included a lengthy discussion regarding the pub-lic safety factor of § 43-276. The court determined that Jeremiah was amenable to treatment provided in juvenile court and adult court. It noted that Jeremiah did not have a history of violent behavior or interaction with law enforcement. The court stated, "The circumstances suggest the sexual assault had a degree of planning and was not merely impulsive." The court reasoned:

> The juvenile court would have several years to work with [Jeremiah] should he be transferred. However, [Jeremiah] will still have the biological and neurological issues that interfere with judgment and impulse control upon leaving the juvenile court jurisdiction at 19.
>
> Although the length of time for treatment and reha-bilitation in juvenile court is several years, the nature and depravity of the offense is concerning. The Court can-not conclude that there is sufficient time to ensure that [Jeremiah] will be of little or no risk for violent behavior if transferred to juvenile court.

In connection with considering Jeremiah's best interests and the security of the public, the court found that the security of the public required that the case remain in adult court.

The court expressed concern about whether treatment, ther-apy, and rehabilitation could be accomplished in a manner protecting public safety by the time Jeremiah reached the age of majority. The court stated, "Based upon the nature of the charged crime and the degree of violence and personal control of the victim involved[,] this Court cannot conclude with confidence that [Jeremiah] will not need to be in a secure detention facility or under supervision past his minority." The court found that Jeremiah would likely need a longer period

of supervision or secure detention than that afforded through the juvenile court. Accordingly, it overruled the transfer motion.

## COURT OF APPEALS' REASONING

Upon Jeremiah's appeal, the Court of Appeals reversed the district court's decision and remanded the cause with directions to sustain the motion to transfer.[19] After a comprehensive review of the evidence, the Court of Appeals determined that the State did not meet its burden of proving a sound basis for retention and that the district court therefore abused its discretion by denying the transfer to juvenile court.

The Court of Appeals found no support in the record for the district court's statements that Jeremiah "'was attempting to mimic pornography he had seen'" and that L.S. "'attempted to scream for the other student.'"[20] The Court of Appeals also questioned the district court's conclusion that Jeremiah recruited G.G. to be a lookout to accomplish a sexual assault, stating that "the evidence could also support that G.G. served as a 'look out' to ensure privacy rather than to conceal criminal intentions."[21]

The Court of Appeals concluded that the district court abused its discretion in denying Jeremiah's request to transfer his case to the juvenile court. The appellate court stated that "[w]hen weighing public protection and societal security against Jeremiah's ability to successfully achieve rehabilitation in a practical and nonproblematical manner while under the age of 19, . . . the evidence in this record favors the latter."[22] The Court of Appeals further stated that "the State offered no expert or other testimony regarding public protection and societal security being a significant concern in this case, nor did it adduce evidence to indicate that Jeremiah

---

[19] See *State v. Jeremiah T., supra* note 3.

[20] *Id.* at *11.

[21] *Id.* at *12.

[22] *Id.* at *13.

could not be successfully rehabilitated while under the juvenile court's jurisdiction."[23] The Court of Appeals noted that numerous options for services and treatments were available in the juvenile court and stated that the evidence supported that Jeremiah would be cooperative in that process.

## STATE'S ARGUMENT AND
## JEREMIAH'S RESPONSE

In the State's petition for further review, it contends that the Court of Appeals erred in two respects. First, the State argues that the Court of Appeals articulated, but failed to follow, the standard of review. Instead, the State contends, the Court of Appeals reweighed public protection and societal security against Jeremiah's ability to successfully achieve rehabilitation. The State observes that the abuse of discretion standard is highly deferential, and it asserts that the Court of Appeals failed to accord the district court's findings that deference.

Second, the State argues that the Court of Appeals erred in finding that parts of the district court's order were unsupported by the record. It contends that the appellate court's opinion omitted relevant context from the district court's order. It further argues that the district court's findings were supported by the record with only one exception: the State concedes that the district court inaccurately stated that L.S. "reported she attempted to scream." That minor inaccuracy, the State asserts, did not rise to an abuse of discretion.

Jeremiah's response contends that the Court of Appeals did not disregard the standard of review, but, rather, found error with a number of the district court's findings. Specifically, Jeremiah argues that the district court erred in finding that he (1) planned a sexual assault, (2) made G.G. aware the encounter was going to be a sexual assault, (3) recruited G.G. to be a lookout to accomplish a sexual assault, and (4) reenacted

---

[23] *Id.*

a pornographic video or admitted to reenacting the same. Jeremiah also asserts that the district court erred in ignoring the treatment timeline contemplated by Jeremiah's expert.

## Discussion

The State's argument relies upon an accurate premise: If the Court of Appeals substitutes its judgment regarding the weight of the evidence, it fails to apply an abuse of discretion standard of review.

The Court of Appeals repeatedly employed reweighing language. The court stated that "our review of the record suggests otherwise."[24] Similarly, it said that "evidence received from Jeremiah, which was not rebutted by the State, clearly favored having this low-risk youth receive services designed especially for juvenile offenders through the juvenile court."[25] The appellate court reasoned that "[w]hile [the district court's construction] is a possibility, there was also another possible explanation presented by the evidence."[26] In the same vein, the appellate court acknowledged that "the evidence could have supported the [district] court's conclusion," but then stated that "the evidence could also support" a different conclusion.[27] The appellate court's penultimate conclusion explicitly engages in reweighing: "When weighing public protection and societal security against Jeremiah's ability to successfully achieve rehabilitation in a practical and nonproblematical manner while under the age of 19, . . . the evidence in this record favors the latter."[28]

This reweighing extended to the appellate court's emphasis on the opinions of Jeremiah's expert witness—specifically,

---

[24] *Id*. at *10.

[25] *Id.* at *11.

[26] *Id.* at *12.

[27] *Id*.

[28] *Id.* at *13.

the conclusion that there was "sufficient time" for Jeremiah to be "rehabilitated before age 19."[29] But the district court was not required to accept Jeremiah's expert's opinions. The appellate court erred in implicitly holding otherwise.

Jeremiah attacks the district court's conclusion in five respects. We consider each one separately, but find none to be persuasive.

First, he argues that the district court erred in finding that Jeremiah "planned a sexual assault."[30] But the district court's finding was more nuanced. The court stated, "The circumstances suggest the sexual assault had a degree of planning and was not merely impulsive." Similarly, it said, "There is also evidence in the record that suggests [Jeremiah] did understand what he had done and that his behaviors were not solely impulsive, but were planned." The appellate court seemed to acknowledge that "possibility."[31] If it is a possible interpretation of the evidence, we cannot say that it is an abuse of discretion.

[9] Second, according to Jeremiah, the district court found that he "made G.G. aware the encounter was going to be a sexual assault."[32] But the district court actually stated that L.S. "indicate[d] that . . . G.G. was positioned as a look out [sic] to protect the assault from interruption." In the documentary evidence, L.S. stated that G.G. was "'there for the whole time, he was just sitting on the stairs and he heard me say "stop" and "I didn't wanna do this," and he didn't help me . . . he was just standing there.'" L.S. told the interviewer that she could see G.G. "when this was happening" but that he "was just on his phone." This evidence circumstantially supported the district court's finding. Circumstantial evidence

---

[29] *Id.* at *11.

[30] Brief for appellant in response to petition for further review at 1.

[31] *State v. Jeremiah T., supra* note 3, 2025 WL 1165671 at *12.

[32] Brief for appellant in response to petition for further review at 1.

is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact.[33]

Jeremiah claims the lower court found that he "recruited G.G. to be a lookout to accomplish a sexual assault."[34] While the appellate court quoted this language, it accurately cited the source of the quotation as Jeremiah's brief. Jeremiah's argument inaccurately attributes those words to the district court.

Next, Jeremiah pointed to a district court finding. The district court said, "[Jeremiah] admits he was reenacting a pornographic video." The court referred to Jeremiah as "attempting to mimic pornography he had seen." But the court did so in the context of Jeremiah's explanation that he "watch[ed] porn," and "'in the porn they be like, "oh stop, stop," . . . and [he] didn't know she was meaning it in that way.'" Jeremiah's expert referred to the pornography explanation and stated that Jeremiah "picked up from that that some women . . . enjoy that or that that's okay." Unlike the appellate court, we view the district court's use of the verbs "mimic" or "reenact[]" as accurate paraphrasing of Jeremiah's expert's characterization that Jeremiah "picked up" that idea from the pornography.

Finally, Jeremiah's argument regarding a treatment timeline largely relied on his expert's testimony. The district court was free to reject that evidence. The appellate court was not empowered to second-guess the district court's assessment of it.

[10] Abuse of discretion is a highly deferential standard of review.[35] It is the standard applicable to reviewing a criminal sentence, where we have explained that "[i]t is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate"

---

[33] *Backhaus v. Backhaus, supra* note 15.

[34] Brief for appellant in response to petition for further review at 1.

[35] *State v. Tyler P., supra* note 15.

and that "[t]he standard is not what sentence we would have imposed."[36] Likewise, in reviewing a trial court's ruling on a transfer motion, an appellate court's function is not to review the record de novo to determine whether we think the case should be transferred. Here, the Court of Appeals articulated reasons why it would have transferred the matter to juvenile court. But an appellate court's review is limited to determining whether the trial court's reasons and rulings are clearly untenable. To be "untenable" is to be "incapable of being defended."[37] Neither the district court's factual findings nor its ultimate refusal to transfer the matter to the juvenile court was clearly untenable. Contrary to the Court of Appeals' conclusion, the district court articulated a sound basis for retaining jurisdiction.

## CONCLUSION

The district court did not abuse its discretion in overruling Jeremiah's motion to transfer the case to the juvenile court, and the Court of Appeals erred in concluding otherwise. Accordingly, we reverse the decision of the Court of Appeals and remand the cause with direction to affirm the order of the district court.

REVERSED AND REMANDED WITH DIRECTION.

---

[36] *State v. Gibson*, 302 Neb. 833, 843, 925 N.W.2d 678, 685 (2019).

[37] Webster's Encyclopedic Unabridged Dictionary of the English Language 1567 (1989).