IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

STATE V. JOSEPH K.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOSEPH K., APPELLANT.

Filed July 22, 2025.    No. A-25-252.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Bekah S. Keller for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

RIEDMANN, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Joseph K. appeals from an order of the Douglas County District Court denying his request to transfer his criminal proceedings to the juvenile court. Finding no abuse of discretion by the district court, we affirm.

## II. BACKGROUND

On September 18, 2024, the State filed an information charging Joseph with two counts of robbery, a Class II felony; three counts of use of a deadly weapon (firearm) to commit a felony, a Class IC felony; and first degree murder, a Class IA felony. The information indicates that the events which gave rise to these charges occurred on or about August 13, 2024. On that date, Joseph was 14 years and 3 months old. He was born in April 2010.

On October 7, 2024, Joseph filed a motion to transfer the matter from district court to juvenile court under Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2022). A juvenile transfer hearing

- 1 -

was held on January 25 and March 6, 2025. The State offered into evidence the police reports which gave rise to Joseph's current adult charges and prior juvenile charges; Joseph's criminal history and certified copies of his prior juvenile cases; Joseph's juvenile intake summaries; a memorandum listing all the probation services previously provided to Joseph; a Douglas County Youth Center (DCYC) status report for Joseph; DCYC investigative reports concerning Joseph; a photograph depicting Joseph with a firearm; a photograph depicting Joseph at the scene of a gas station robbery; several surveillance videos depicting the events underlying Joseph's current charges; and information concerning general DCYC services. The State also called Heather Briggs, the chief deputy probation officer at Douglas County Juvenile Probation, and Officer Chad Frodyma, an Omaha police officer, to testify.

Joseph offered into evidence a forensic psychological evaluation written by Kari R. Perez, Ph.D., P.C., as well as two character references written by DCYC juvenile detention specialists. Perez also testified at the hearing.

### 1. AUGUST 2024 VEHICLE THEFTS, ROBBERIES, AND MURDER

On August 13, 2024, just before midnight, Omaha police officers were dispatched to a residence in response to a shooting. Upon arrival, the officers discovered that the victim, Mursal Jama, was shot in the abdomen during a carjacking. Jama's vehicle, a black 2020 Kia Sportage, was stolen before the police arrived. Jama was transported to a local hospital and declared deceased shortly upon arrival.

On August 14, 2024, around 2:30 a.m., Jama's vehicle was spotted in Nebraska City by local police. A car chase ensued involving three different police departments, including the Nebraska State Patrol. Speeds during the pursuit surpassed 100 m.p.h., and the pursuit ended in Omaha only after State Patrol successfully deployed a spike strip. Six juveniles fled from the vehicle as it rolled to a stop. Joseph was seen exiting the back driver's side of the vehicle. Four of the juveniles, including Joseph, were immediately apprehended following a foot chase. The remaining two juveniles were identified and arrested within the following week.

During the investigation, officers discovered that the six juvenile suspects were involved in a 2-day crime spree leading up to the murder. The crime spree involved a series of stolen vehicles and the burglary of a gun shop. Police reports reveal that on August 12, 2024, three vehicles were stolen in succession, one from Omaha and two from Kansas City, Missouri. One of the Kansas City vehicles was a blue 2020 Kia Optima.

On August 13, 2024, around 6:30 a.m., a gun shop in Nebraska City was burglarized by three juvenile males, one of which was later identified as Joseph. Among the items stolen were nine firearms. The vehicle driven by the suspects and observed on surveillance video was a blue Kia Optima.

Hours after the burglary, the stolen blue Kia was found abandoned in Omaha. Between 7:30 a.m. and 10:30 p.m., four subsequent vehicle thefts occurred throughout the Omaha and Elkhorn areas. Around 11 p.m., a robbery occurred at a QuikTrip gas station in West Omaha. Two individuals were in a vehicle parked at a gas pump. As the driver exited the vehicle and began walking toward the store, he was approached by six juveniles, one of which was later identified as Joseph. Three of the juveniles, including Joseph, were wielding handguns during this incident. The juveniles robbed the driver, then approached the passenger in the vehicle and robbed him as well.

The passenger reported that the juveniles also demanded the keys to the vehicle, but that he fled the scene without handing them over.

Between 11 p.m. and 12 a.m., two more vehicles in the nearby area were broken into and damaged. These attempted vehicle thefts occurred less than a half mile from where Jama was fatally shot. As previously stated, the shooting occurred just before midnight, and a couple hours later, Jama's vehicle was spotted by police at the gun shop in Nebraska City that was burglarized the day before, resulting in the car chase and Joseph's arrest.

After his arrest, Joseph declined to speak to the police. His phone was searched pursuant to a warrant, and the GPS positioning coincided with the locations of the vehicle thefts, robberies, and murder described above. Additionally, a video taken on August 13, 2024, and found on Joseph's phone depicts Joseph with a firearm.

2. JOSEPH'S PRIOR OFFENSES

Joseph's first contact with law enforcement occurred in December 2023 when he was arrested for burglary, which was later amended to theft by unlawful taking, $500 or less, and first degree trespass. A few days prior, Joseph's mother reported that Joseph had stolen her work keys, ran away from home, and gained access to her place of work after normal business hours. Joseph was located by police at his middle school campus.

At the time of his arrest, Joseph had in his possession his mother's work keys and eight $25 prepaid gift cards stolen from her place of work. Joseph also had a video game console and a cell phone in his possession. His mother informed police that she had taken these electronic items away from Joseph and stored them in her work office. Joseph's mother also reported that $3,200 in cash was missing from the business, but Joseph did not have any cash on him at the time of his arrest and denied taking any money.

Joseph was initially detained at the Sarpy County Juvenile Justice Center (JJC). Following an adjudication hearing, he was released into his mother's care, placed on home electronic monitoring, and received in-home family services provided by Boys Town. In February 2024, Joseph was placed on probation. In March 2024, Joseph successfully completed GPS monitoring. However, that same month, he was cited for disturbing the peace, which was a violation of his probation.

In April 2024, Joseph was charged in a second juvenile case with disturbing the peace and attempted theft by unlawful taking, $500 or less. Police reports indicate that while Joseph was socializing with a group of juveniles, he attempted to take a 10-year-old's bicycle. When the 10-year-old did not comply, Joseph became aggressive and grabbed the victim's hoodie. Joseph was briefly detained after this incident but ultimately released to his mother.

On June 18, 2024, Joseph ran away from home. On June 22, Joseph was located and placed back with his mother. He was also placed back on GPS monitoring. The following day, Joseph removed his GPS device and once again absconded. On July 3, Joseph was arrested and placed at the JJC. The juvenile court instructed the probation office to seek out-of-home placement options for Joseph. Until a placement was found, Joseph was ordered to remain at the JJC.

While at the JJC, two new juvenile cases were brought against Joseph. On July 15, 2024, Joseph flipped a television cart over, damaging the television in the process. Joseph was charged with criminal mischief, less than $500. On July 26, a JJC staff member approached Joseph in the

cafeteria and asked him to remove his sweatshirt. In response, Joseph threw a chair onto the ground. While Joseph was being escorted out of the cafeteria, he struck a staff member in the face with a closed fist. Joseph was charged with third degree assault causing bodily injury.

Due to safety concerns regarding Joseph's aggressive behavior toward others, group home applications made on his behalf to Boys Town and Omaha Home for Boys were denied. However, shelter applications to Boys Town, Omaha Home for Boys, and the Child Saving Institute (CSI) were accepted.

On August 7, 2024, Joseph was placed at the CSI shelter. On his second day there, Joseph had an altercation involving at least two other juveniles. Joseph was purportedly fearful of losing his placement at CSI due to the altercation. Thus, on August 10, Joseph absconded alongside the two juveniles he had fought with days earlier. Shortly after absconding, he allegedly participated in the events underlying his current charges. The two juveniles Joseph absconded with are also facing charges for their alleged participation in the crimes. In light of the current charges, Joseph's juvenile cases have been continued until the current matter is resolved.

After being arrested for the current charges, Joseph was not permitted to return to the CSI shelter and was instead detained at the DCYC. While there, he committed four major rule violations. The first violation occurred on August 28, 2024, when Joseph participated in a group fight and threw closed fist blows at another juvenile. On October 24, Joseph threw two glasses of water onto another juvenile and was cited for assault on another detainee. On December 20, Joseph made several sexual comments toward a DCYC staff member. The staff member gave Joseph several direct orders to refrain from making further comments, but he did not desist. Joseph was cited for "disobeying a direct order – sexual activities." On January 1, 2025, Joseph began fighting with another juvenile over the television. Joseph said, "fuck your dead homies," and the other juvenile initiated a physical fight, which Joseph participated in "for a period of time."

A DCYC status report indicates that Joseph regularly attends classes and works diligently on his schoolwork. The report also states that Joseph has mostly positive peer relations and is respectful to staff. However, the report also notes that Joseph sometimes struggles with inappropriate behaviors and boundaries. Two DCYC juvenile detention specialists penned character references in support of Joseph. They described Joseph as a respectful and model detainee and highlighted both his progress and his aspirations for a better future.

### 3. TESTIMONY REGARDING TREATMENT RECOMMENDATIONS

At the hearing on Joseph's motion to transfer, Briggs, the chief deputy probation officer for Douglas County Juvenile Probation, was called by the State and testified. Briggs testified that Joseph has been somewhat resistant in talking with his probation officer and that there are concerns with his overall accountability for his behaviors. Briggs elaborated that Joseph has blamed others for his current situation and has failed to take the matter seriously. For example, Joseph told his probation officer that if the victim in this case wanted to die over his car, that was his choice.

Briggs testified that if this case was transferred to the juvenile court, she would recommend Joseph be committed to the Youth Rehabilitation and Treatment Center (YRTC). She explained that the YRTC is a juvenile jail and is generally used as a last resort. The average stay at the YRTC is between 6 to 9 months. Briggs based her recommendation on the denials Joseph received from various group homes prior to receiving the current charges. Briggs testified that new barriers to

placing Joseph in a group home included the current charges, the circumstances of the offense (including the fact that the murder victim was seemingly random), Joseph's aggression while in detention, and his runaway behaviors.

Briggs testified that if Joseph were placed at the YRTC, she would have concerns about him absconding and resisting participation based on his history with juvenile services. She would also have concerns for public safety. Briggs testified that once Joseph completed the YRTC program, he would most likely be returned to his mother's care and placed on community-based supervision. She explained that it would be rare for a juvenile to be placed in a group home after completing the YRTC program. When asked whether Joseph could be rehabilitated before he turns 19 years old, Briggs testified that it was "up to the youth and the family as to whether they accept the services and are successful."

Perez, a clinical and forensic psychologist, was called as a witness by Joseph. In January 2025, Perez conducted a psychological and forensic evaluation of Joseph. In furtherance of her evaluation, she reviewed relevant police reports, education reports, Department of Health and Human Services (DHHS) records, medical records, and Joseph's prior case and detention documents from Sarpy County. Perez also interviewed Joseph's mother, his family doctor, his godfather, as well as Joseph himself.

Perez' interview with Joseph spanned 4 days and totaled 5½ hours. She described him as cooperative, but at times, inarticulate. She also testified that throughout the interview, Joseph displayed a flat affect, which indicated he had some depression.

Perez learned that Joseph was made a ward of the state at birth and was immediately placed in foster care. According to Perez' review of the DHHS records, Joseph's mother was described as aggressive and irrational and having little to no concern regarding her infant child. Joseph's father was in and out of jail throughout Joseph's lifetime.

Joseph's mother was unsure when Joseph was returned to her care but guessed that he was around 8 months old. After reviewing DHHS records, Perez determined that Joseph was in and out of foster care from age 3 to approximately age 7. Perez testified that there were "some pretty serious descriptions of abuse, child abuse, that had occurred that took [Joseph] out of the home." Once Joseph was returned to his mother's care, he continued to report her abusive behavior to other adults, but none of those reports were deemed credible. Perez described Joseph's overall family dynamic as "volatile."

Perez testified that Joseph's childhood was difficult in some respects and positive in others. Joseph was a good student in elementary school and participated in extracurricular activities such as basketball, football, and Boy Scouts. However, when Joseph's mother gained custody of him around age 7, the school began reporting behavioral problems. Joseph engaged in five aggressive incidents over a 6-year period and also engaged in a theft-type incident. Most of these incidents were described as infractions that did not result in suspension. In response to his behavioral outbursts, Joseph was enrolled in individual therapy, but Perez described this treatment as "intermittent" and expressed doubts as to how effective the therapy was in addressing Joseph's trauma.

Perez testified that Joseph began having more serious problems around age 12. This is when Joseph began running away from home, becoming more defiant, having more problems at school, and socializing with a delinquent peer group. Joseph also began using marijuana. Joseph's

first juvenile case concerning the theft and trespassing at his mom's work office occurred around this time.

Perez testified that Joseph admitted to being recruited by the South Family gang. Joseph told Perez that he had been involved with the gang for approximately 1 year and was a member for protection purposes. Joseph told Perez that many kids in his neighborhood were gang members, including one of his older brothers. Perez testified that Joseph's admission was the only information she uncovered concerning his gang activity, and that she did not know how deep his affiliation was.

During the interview, Perez discussed with Joseph his flight from CSI and the events leading to the current charges. Joseph told Perez that he and two other juveniles fled to avoid punishment for fighting. Joseph also told Perez that the older juvenile he fled with proposed that they steal cars. The older juvenile told Joseph that he had prior experience doing so. Joseph denied ever stealing cars before that time. Joseph told Perez that he was initially fearful of stealing cars, but that the other juveniles told him to "chill out." Perez testified that Joseph was "very peer influenced," especially by older peers.

Joseph indicated to Perez that his motive for the crimes was to steal vehicles and firearms. Perez testified that Joseph expressed remorse and shame over his actions. She also testified that Joseph would have been aware during the commission of these crimes that his actions were wrong.

Perez diagnosed Joseph with severe conduct disorder, severe cannabis use disorder, ADHD, unspecified trauma and stressor-related disorder, major depressive disorder, and generalized anxiety. She testified that Joseph also has some deficits in development. She elaborated that he is more impulsive than most adolescents his age and does not consider the consequences of his actions. His forensic assessment results indicate that he poses a moderate risk for violent recidivism and a moderate risk for dangerousness when compared with other juvenile delinquents. Joseph fell in the middle offender range on the sophistication-maturity scale and on the treatment amenability scale.

Based on all the available information, Perez concluded that while there is a concern that Joseph is at risk for engaging in further delinquency without intervention, he is not committed to a criminal lifestyle and is amenable to treatment. Perez believes that Joseph's age "allows for participation in a structured, intensive residential treatment program that is available within the juvenile justice system, and it is also very likely that he can complete such a program" before reaching the age of maturity. She recommended a facility like RADIUS, which is not considered a group home, but rather a higher tier of supervision.

RADIUS offers residential services for juvenile offenders as well as on-site schooling and in-home services. Juveniles are required to participate in therapy while at RADIUS. Perez toured the RADIUS facility with the program director and learned that RADIUS would accept a juvenile that had been charged with first degree murder, as it does not discriminate based on charges alone. RADIUS is not a locked or secure facility, but it does have a 24-hour awake staff, which is different from most group homes wherein the staff sleep at night. Perez admitted that if placed in a facility like RADIUS, there was still a risk that Joseph would abscond.

Perez testified that when compared to other juveniles involved in serious offenses, Joseph did not present a heightened risk to the community. However, Perez noted that if Joseph were to reside with his mother, a regression of treatment could occur. Thus, she recommended that once

he was released from a residential facility, he should receive additional outpatient treatment services and potentially be placed in foster care.

### 4. DISTRICT COURT'S ORDER

On March 27, 2025, the district court entered an 8-page order denying Joseph's motion to transfer his case to the juvenile court. The court found that the State had met its burden of proof and had shown a sound basis to retain Joseph's case in the district court. The details of the district court's consideration of the transfer factors contained in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2022) will be provided in our analysis below.

Joseph appeals the denial of his motion to transfer this case to the juvenile court.

## III. ASSIGNMENTS OF ERROR

Joseph assigns that (1) the district court erred by disregarding the rehabilitative purpose of § 29-1816 and focusing instead on punitive outcomes, (2) the district court abused its discretion in denying his motion to transfer, and (3) the State offered insufficient evidence to sustain retention of the case in district court.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023).

## V. ANALYSIS

### 1. LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all of the allegations against Joseph put him within the latter category of juvenile offenders, and the State filed charges against Joseph in the district court.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3).

In the instant case, when Joseph moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including

whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "[T]he burden of proving a sound basis for retention lies with the State." *Id.* at 557, 990 N.W.2d at 926.

### 2. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

In his brief on appeal, Joseph alleges that the district court abused its discretion in the manner in which it analyzed the relevant statutory factors delineated in § 43-276(1). Joseph argues that the court disregarded the rehabilitative purpose of § 29-1816 and instead focused on punitive outcomes. He also argues that the State offered insufficient evidence to sustain retention of the proceedings in the district court. To the contrary, the State contends it provided a sound basis for retention which the court ultimately relied on. We agree with the State that the district court did not abuse its discretion in retaining jurisdiction over the case.

### (a) Factors Found by District Court to Favor Retention

In its March 2025 order denying Joseph's motion to transfer, the district court addressed each of the factors contained in § 43-276(1). While the court did not specifically identify each factor as favoring retention or transfer, we can surmise from the court's analysis that it found that the following seven factors support retention in the district court.

Under § 43-276(1)(b), whether the alleged offense included violence, the district court found that "[v]iolence is present in that a gun was used" during both the alleged robbery and murder. Joseph does not contest that the alleged offenses were violent in nature. We agree that this

factor supports retention in the district court. The reckless and aggressive use of firearms throughout a 2-day crime spree wherein the perpetrators threatened the lives of at least three individuals and killed a random victim to steal his vehicle is inherently violent.

Under § 43-276(1)(c), the motivation for the offense, the district court found that "[n]o specific information is available as to this factor but greed and an inability to comply with societal norms are likely contributors to [Joseph's] alleged actions." Joseph argues that the court attributed a level of sophistication to his actions that was not supported by the evidence. He counters that the evidence actually shows that he was motivated by fear and desperation. While we acknowledge that Joseph expressed to Perez that he was initially hesitant to participate in the car thefts, the evidence shows that he participated in seven successful thefts and two attempted thefts in a 2-day period. This string of crimes suggests that at some point, Joseph was no longer hesitant to steal cars.

His escalation of offenses further indicates that any fear or desperation Joseph may have initially felt gave way to a certain amount of confidence in his criminal conduct. The burglary of the gun store and the use of handguns to threaten individuals in the QuikTrip robbery was random and senseless. Joseph informed Perez that his motive for these offenses was simply to steal cars and firearms. As such, we cannot say the district court abused its discretion in finding this factor weighs in favor of retention.

Under § 43-276(1)(e), the previous history of the juvenile, the district court noted that Joseph had been adjudicated in the juvenile court "at least three (3) times previously and [Joseph] has largely been noncompliant with the efforts of the Juvenile Court on these previous occasions." On appeal, Joseph argues that the district court erred in determining that he was noncompliant with previously offered services. He relies on Perez' testimony and report which state that he was provided "little and ineffective treatment." Brief for appellant at 35. The State counters that as the trier of fact, the district court is not required to take the opinions of experts as binding upon it. See *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025).

Given the evidence presented, we cannot say that the district court abused its discretion in finding that this factor weighs in favor of retention. The record establishes that Joseph's past criminal behavior includes theft, trespass, criminal mischief, disturbing the peace, and third degree assault causing bodily injury. Joseph has failed to abide by the terms of his juvenile probation, received additional charges while on probation, absconded from his mother's home several times and once from CSI within days of being placed there, and exhibited increasingly violent conduct. Given Joseph's escalating criminal behavior and his failure to comply with previously offered juvenile services, we agree that this factor favors retention in the district court.

Under § 43-276(1)(g), consideration of public safety, the district court found:

Given the nature of [Joseph's] previous noncompliance with the Juvenile Court interventions, the violence here in which he is alleged to have been involved and the relatively short time the Juvenile Court would have to act before [Joseph] turns 19 years of age, it is in the interest of public safety that he be subject to supervision beyond the age of 19. [Joseph] apparently has little regard for human life, e.g., his statement about [Jama] dying over his car.

Joseph argues that despite the violent nature of his alleged offenses, the record does not support the conclusion that he is a public safety risk. We disagree. The incidents underlying Joseph's alleged offenses are extremely serious and caused the senseless death of a random victim. Joseph's statement regarding Jama choosing to die over his vehicle shows a severe lack of empathy. Moreover, Joseph's runaway behaviors and his susceptibility to peer pressure suggest that if he were to receive juvenile services, he could abscond and commit additional crimes. With these facts in mind, we can find no abuse of discretion in the district court's conclusion that Joseph poses a risk to public safety and that this factor weighs in favor of retention.

For similar reasons, the district court found that weighing the best interests of the juvenile in conjunction with the security of the public under § 43-276(1)(i) required that the juvenile continue in secure detention or under supervision for a period extending beyond the age of 19. We agree that this factor also supports retention. Joseph was given the opportunity to receive residential treatment through the juvenile system. Within days of being placed at CSI, he engaged in a fight and then absconded. His juvenile adjudication history suggests he may very well need secure detention or supervision beyond his minority, and the security of the public supports that conclusion.

Under § 43-276(1)(l), whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm, the court reiterated that Joseph is alleged to have used a stolen firearm in the offenses and noted there is video evidence from the QuikTrip robbery of Joseph wielding a handgun. Joseph argues that the district court erred in determining that this factor weighed in favor of retention because he has no prior offenses involving firearms. We disagree with Joseph, as the factor instructs courts to consider prior convictions involving firearms *or* acknowledgment of unauthorized possession or use of firearms. The latter portion clearly applies in this case. Joseph is alleged to have participated in a gun store burglary wherein nine guns were stolen and then used to rob random victims. In his interview with Perez, Joseph acknowledged that he stole firearms. There is also photographic and video evidence of Joseph wielding firearms over the 2-day crime spree. The district court did not abuse its discretion in concluding this factor weighs in favor of retention.

Under § 43-276(1)(n), whether the juvenile is a criminal street gang member, the district court found that both Briggs and Perez testified that Joseph had gang affiliations. Joseph argues that Briggs did not testify that he had any gang involvement and that the only evidence of gang ties was his admission to Perez of such ties. Thus, Joseph concludes that the record did not support a conclusion that Joseph is a criminal street gang member. This argument is unconvincing. While it is true that Briggs did not testify about gang involvement, it is also true that Joseph told Perez that he was a member of the South Family gang and had been a gang member for 1 year. There was no reason for the district court to disregard Joseph's own admissions. Thus, the district court did not abuse its discretion in finding that this factor weighs in favor of retention.

(b) Factors Found by District Court That Do Not Support Retention

Under § 43-276(1)(o), such other matters as the parties deem relevant, the court noted that Joseph had a tumultuous childhood which included foster care, instances of physical abuse, and his mother's "disinterest in parenting." We agree that Joseph's disadvantaged upbringing does not support retention.

The district court found that neither party presented any evidence regarding § 43-276(1)(j), whether the victim or juvenile agree to participate in restorative justice; (k), availability of pretrial diversion; and (m), presence of prior juvenile court order pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016). We agree. Thus, given the Supreme Court's directive in *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023), that any factor found not to favor retention should be considered a factor that does not support a sound basis for retention, we find that these factors do not support retention.

### (c) Factors Addressed But Not Specifically Resolved by District Court

Under § 43-276(1)(a), the type of treatment Joseph would be amenable to, the district court found:

> According to Ms. Briggs the only treatment available is the YRTC but there is concern that [Joseph] would abscond—which he did after three days at CSI. According to Dr. Perez, [Joseph's] age "allows for participation in a structured, intensive residential treatment program that is available within the juvenile justice system, and it is very likely he will have time for community supervision prior to his 19th birthday as it is over four years away." The Court believes that the "typical" stay at YRTC of six to nine months is by no means an adequate time for the type of charges here and [Joseph's] return to the community in such a short period of time would again put the community at risk. In his time at DCYC since August 14, 2024, which is secured detention. [Joseph] has engaged in two fights, committed four major rule violations including an assault on a detainee and disobeying a direct order. Even Dr. Perez noted that treatment of [Joseph] would be fairly challenging with a difficult treatment process and there is a probability that regression would occur. Dr. Perez stated in her testimony that [Joseph] is in the "middle offender range" for treatment amenability and that [Joseph] is not "more of a risk than anyone else involved in a serious offense".

At the outset, we acknowledge that in considering what treatment Joseph would be amenable to, the district court referenced other, separate transfer factors. Nevertheless, we agree with the court's general assessment that the evidence on this factor was mixed. If this case were transferred to the juvenile court, Briggs recommended YRTC, but Perez recommended a residential program like RADIUS. Both Briggs and Perez had concerns that in either scenario, Joseph would abscond.

Joseph asserts that the State offered no evidence of what type of treatment would be best for him or how long he would need to be subjected to said treatment. However, the record shows that the State did present evidence on this issue. When asked whether Joseph could be rehabilitated before age 19, Briggs testified that it was "up to the youth and the family as to whether they accept the services and are successful." Joseph's history of refusing juvenile services and absconding from various placements indicate that he may not successfully participate in future juvenile services.

Joseph also argues in his opening brief and reply brief that when the court found that the typical stay at YRTC "is by no means an adequate time for the type of charges here," it inappropriately focused on punitive goals and showed bias against the crimes for which he was charged. The State counters that, contrary to Joseph's assertion, the court was concerned that a

stay of only 6 to 9 months would put the community at risk. We agree with the State. The court was clearly attempting to apply the balancing test by weighing Joseph's rehabilitative needs against public safety concerns. The quotation Joseph focuses on would be concerning if it was meant to stand on its own, but when read in context with the rest of the sentence, it is clear that the court is expressing doubts as to Joseph's ability to rehabilitate before his 19th birthday. We cannot say that these doubts are unsupported based upon other circumstantial evidence contained in the record. While there would be approximately 4 years to treat Joseph with juvenile services, given his failure to comply with prior probation orders and previously offered residential programs, we conclude this factor weighs slightly in favor of retention.

Under § 43-276(1)(d), the age of the juvenile and the ages and circumstances of any others involved in the offense, the district court noted that Joseph was 14 years old, and his codefendants ranged in age from 11 to 17 years old. The court also noted that all the alleged juvenile offenders have had multiple court dockets and run-ins with law enforcement. Given that the juvenile court would have over 4 years to rehabilitate Joseph, we find that this factor weighs against retention.

Under § 43-276(1)(f), the best interests of the juvenile, the district court found that it is in Joseph's best interests that these proceedings be transferred to the juvenile court. However, it also noted that it may be in Joseph's best interests to receive services beyond the age of maturity. We find that, like any other juvenile, Joseph's long-term interests would be best served with adjudication in the juvenile court rather than facing serious felony charges in the district court.

Under § 43-276(1)(h), consideration of the juvenile's ability to appreciate the nature and seriousness of his conduct, the district court found that "[o]ther than Dr. Perez's insight on this issue, and Ms. Briggs testimony about [Joseph's] lack of accountability, the Court has little information as to this factor." We note that the record reflects that Briggs was concerned with Joseph's failure to take the matter seriously and his overall accountability for his actions while Perez testified that Joseph would have been aware during the commission of these crimes that his actions were wrong. However, Perez also testified that Joseph expressed remorse and shame over his actions. Given Joseph's acknowledgment of the wrongfulness of his actions, this factor, to some degree, weighs in favor of retention in the district court.

(d) No Abuse of Discretion

Out of the seven factors the district court deemed to favor retention, we agree that each of those factors support retention. The court properly considered the violence in the alleged offenses, Joseph's unsuccessful history in the juvenile court, and public safety concerns. While the court found that less than half the transfer factors supported retention, there is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025). It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.*

When considering the entire record before us, we cannot say that the district court abused its discretion in denying Joseph's motion to transfer these proceedings to the juvenile court. Joseph has exhibited escalating criminal behavior and an inability or unwillingness to participate in

juvenile services. His alleged participation in multiple vehicle thefts, the burglary of a gun store, the use of firearms during the QuikTrip robbery, and the murder of Jama all heavily weigh in favor of retention. While the juvenile court would have 4 years to supervise Joseph, the evidence casts serious doubts on Joseph's willingness to participate in juvenile services and his ability to be rehabilitated in that time.

As the Supreme Court has recently emphasized, abuse of discretion is a highly deferential standard of review. *State v. Jeremiah T., supra*. In reviewing a trial court's ruling on a transfer motion, an appellate court's function is not to review the record de novo to determine whether we think the case should be transferred. *Id.* An appellate court's review is limited to determining whether the trial court's reasons and rulings are clearly untenable. *Id.* To be "untenable" is to be "incapable of being defended." *Id.* at 152, 21 N.W.3d at 327. In this case, the district court provided a sound basis for retaining jurisdiction. Accordingly, we find no abuse of discretion in the district court's order denying the motion to transfer.

## VI. CONCLUSION

For all the reasons stated above, we affirm the district court's order denying Joseph's motion to transfer the proceedings to the juvenile court.

AFFIRMED.