IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. NUNN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ZYREONJAY NUNN, APPELLANT.

Filed February 10, 2026.    No. A-25-700.

Appeal from the District Court for Douglas County: LEANNE M. SRB, Judge. Affirmed.

Jim K. McGough for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Zyreonjay Nunn appeals from the denial of his request to transfer his criminal case from the Douglas County District Court to the juvenile court. Nunn contends that the district court erred in failing to properly weigh statutory factors and the presumption favoring transfer, in relying on evidence related to gang involvement by others, and in discounting evidence related to his amenability to treatment. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

On September 12, 2024, Nunn, along with other individuals, allegedly participated in an attempted robbery of an Omaha, Nebraska, pawn shop. Surveillance footage obtained from the pawn shop depicted the four perpetrators, including Nunn, entering the pawn shop and Nunn attempting to break into a glass case containing guns. During the attempted robbery, some of the

- 1 -

perpetrators brandished firearms, pointed firearms at pawn shop employees, and at least one shot was fired inside the pawn shop. Nunn was apprehended by police shortly after the attempted robbery and officers located two firearms on Nunn's person, both of which had been stolen in a separate robbery committed by Pratt Street Gang members on September 1, 2024. Nunn was 15 years old and was on juvenile court probation at the time of the attempted robbery. Nunn was charged in Douglas County District Court with attempted robbery, a Class IIA felony; use of a firearm to commit a felony, a Class IC felony; and two counts of possession of a stolen firearm, Class IIA felonies. Nunn filed a motion to transfer his case to juvenile court and a hearing thereon was held over the course of 3 days.

2. HEARING ON MOTION TO TRANSFER

During the hearing on Nunn's motion to transfer, the State called witnesses, including several law enforcement officers and Crystal Hins, Nunn's juvenile probation officer. Nunn called two witnesses on his behalf: Dr. Kirk Newring, the psychologist who performed an evaluation on Nunn; and Martena Nunn, Nunn's mother.

(a) Apprehension of Nunn by Law Enforcement

On September 12, 2024, at approximately 7:30 p.m., Officer Ryan Keele responded to a call regarding a vehicle description matching a vehicle involved in a suspected attempted robbery of a pawn shop. When Officer Keele conducted a stop of the vehicle, the rear driver's side door opened, and the occupant, later identified as Nunn, immediately fled on foot. After Nunn ignored Officer Keele's verbal command to stop, Officer Keele released his service dog, who apprehended Nunn.

Shortly thereafter, Detective Andrew Ramsay arrived on the scene, arrested Nunn, and conducted a search of Nunn's person during which he located two stolen handguns in Nunn's left front pants pocket, a cell phone, and other miscellaneous items. The guns found on Nunn's person had been stolen in a previous robbery.

(b) Search of Nunn's Cell Phone

Nunn's cell phone was searched pursuant to a search warrant, and data from August 1 to September 16, 2024, was retrieved from the phone. The search uncovered a series of text messages on September 12, the day of the attempted pawn shop robbery, sent from Nunn's cell phone and text messages sent within another application. In these messages, generated shortly after the attempted robbery, Nunn sent a screenshot of the "Omaha Scanner" page depicting the attempted robbery of the pawn shop with a caption from Nunn stating, "I made it to the scanner." The search of Nunn's phone uncovered multiple videos depicting Nunn with a known gang member and in some of the videos, according to Jessica Rich, a police officer assigned to the robbery unit, "they were displaying gang signs that were associated with [the] Pratt Street gang." In other posts or texts, Nunn claimed to be a member of the Pratt Street gang, claimed that he was going to get a gun, talked about a plan to rob a gun store, described a dream that he had about getting caught robbing a gun store, and stated that he liked the way a gun feels in his hand. Other videos located on Nunn's phone, which were taken before the attempted robbery, appeared to show a gun display case inside of a pawn shop. The search also revealed messages indicating that the possible

motivation for the attempted robbery was to avenge the September 10, 2024, shooting of Nunn's friend Jamorion Fant. During the search of Nunn's cell phone, law enforcement also located evidence that Nunn may have committed additional crimes for which he has not been prosecuted.

(c) Hins' Testimony

Hins testified that she has been Nunn's juvenile probation officer since April 2024. At that time, Nunn had three open dockets with the juvenile court and was in secure detention at the Douglas County Youth Center (DCYC) following his termination from the Home on Monitoring Equipment program (H.O.M.E.). The H.O.M.E. program allows a juvenile to be home while on electronic monitoring and tracer supervision as an alternative to detention at DCYC. In April, Nunn admitted to charges in one juvenile docket of obstructing a peace officer and in two other juvenile dockets charging him with unauthorized use of a propelled vehicle.

Hins testified that, as a juvenile probation officer, she is familiar with rehabilitative services available to juvenile offenders within the juvenile court system. These services include an evaluation, therapy, required attendance at school, participation in social activities, drug testing, the obligation for the juvenile to refrain from unlawful conduct, the obligation for the juvenile to refrain from using drugs or alcohol, in-home or out-of-home placement (including shelter placement, group home placement, out-of-state placements), and in-home services (such as a community youth coach, family support, intensive family preservation, multi-systematic therapy).

Hins testified that in May 2024, Nunn was sent to CEDARS for community-based shelter placement. According to Hins, "[s]helter placement is a temporary place for crisis stabilization that usually lasts between two weeks to up to 45 days." After successfully completing the CEDARS program, Nunn was allowed to return to his mother's home in late June 2024. According to Hins, during the time Nunn was permitted to reside at his mother's home, services provided to him by juvenile probation included the H.O.M.E. program; seven shelter referrals; a co-occurring evaluation; a referral for a psychiatric evaluation; crisis stabilization; gang intervention; a referral for mediation; electronic monitoring/GPS; and an intensive outpatient program intake. Nunn was subsequently placed in secure detention at DCYC for the current charges.

Nunn completed a co-occurring evaluation, which included diagnoses of severe cannabis use disorder, mild alcohol use disorder, and nicotine disorder. The co-occurring evaluation recommended that Nunn participate in level 2.1 intensive outpatient treatment, which "is where you're doing group sessions about three times a week and you do an individual session one time a week to address your substance use." Hins referred Nunn for level 2.1 intensive outpatient treatment in July. Due to a wait list, Nunn's intake occurred in September 2024. Nunn was unable to complete his level 2.1 treatment because he was detained shortly after the intake.

Nunn did not complete the psychiatric evaluation because the wait list was so long that they were unable to get the evaluation scheduled prior to Nunn being detained in September 2024. Nunn also did not participate in mediation services because, although he was referred for those services in July 2024, Nunn was detained before the mediation services could be arranged.

Although Nunn was ordered to participate in a pro-social activity at school or in the community or to obtain employment between May and September 2024, Nunn did not engage in any type of organized pro-social activity. However, after Nunn informed probation that he was a member of a gang, gang intervention services were also provided to him. According to Hins, the

gang interventionist met with Nunn "almost on a daily basis," and when Nunn was not in school, the gang interventionist took Nunn to do volunteer work, such as helping the elderly with transportation, groceries, or mail. Hins stated that, although Nunn was seeking employment, "due to his age, it was becoming difficult to actually find him paid employment, which is why he was doing the volunteer work with [a gang interventionist]."

Hins acknowledged that between June and September 2024, when Nunn was living at home, he was receiving services including gang intervention and electronic monitoring. However, despite actively working with a gang intervention specialist, Nunn continued to socialize with a negative peer group. And despite the services provided to Nunn by juvenile probation, Nunn tested positive for THC. Hins placed Nunn on electronic monitoring because there were "a lot" of times when Hins and Nunn's mother did not know Nunn's whereabouts, including overnights. Despite the electronic monitoring, Nunn still snuck out of his mother's home twice and he picked up additional juvenile court charges for two counts of attempted theft by unlawful taking ($5,000 or more). In September, Nunn cut off his electronic monitor just prior to the September attempted robbery and picked up another juvenile court charge for possession of a handgun by a minor and obstructing a peace officer.

After Nunn was detained at DCYC in September 2024, Hins testified that Nunn was terminated from most probation services, that Hins had not made any additional referrals for Nunn, and that she was unaware of any intensive outpatient programs available to Nunn at the DCYC. However, she met with Nunn on a nearly weekly basis, and during those visits, Nunn talked about the books he had read and the completion of certain educational curriculum for credits, skill-building, staying away from negativity, and avoiding conflicts. Hins also stated that Nunn completed a victim empathy class while at DCYC.

Hins testified that if Nunn were not at DCYC, he would have more services available to him, such as a community coach, gang intervention, family support, multi-systemic therapy, and group therapy. According to Hins, Nunn has

> always been engaged with me. He's always been polite and respectful. I feel like he's been pretty honest, for the most part, when we talk about things that are going on with him. So I feel like we have a pretty good relationship at this point, that I can help him become a very successful person.

She further testified that Nunn "deserves a chance to be home with services in place. We've had him for such a short amount of time before he was detained that we really didn't get a chance to . . . implement everything that we could" and that "[w]e haven't exhausted all of our efforts." However, Hins admitted that, at the time of the transfer hearing, Nunn had five open juvenile court dockets, and he had been adjudicated once for obstructing a peace officer and twice for unauthorized use of a propelled vehicle. Hins admitted that she had not spoken to Nunn about his most recent charges and had only received "[v]ery general information" about the nature and circumstances of Nunn's current charges. Hins also admitted that, while at DCYC, Nunn had "been involved in several altercations" that included Nunn instigating unprovoked attacks on other juveniles.

- 4 -

### (d) Dr. Newring's Testimony

Dr. Newring testified that he is a psychologist and a certified threat manager, which he explained as being trained to assess both threats made by juveniles and potential threats that juveniles can present to communities. Dr. Newring conducted a juvenile transfer review assessment of Nunn that included reviewing available records, IQ testing, academic ability testing, mood assessment, personality assessment, risk assessment, clinician administrator tests, and assessments completed by Nunn. After interviewing Nunn, Dr. Newring completed the risk assessment, which he described as "a structured professional judgment approach to take the gathered information . . . [and] then form risk assessment considerations." Dr. Newring then compiled the aforementioned information in a written report that was completed in late March 2025 and admitted into evidence as exhibit 62.

Dr. Newring diagnosed Nunn with post-traumatic stress disorder, adjustment disorder with anxiety and depression, and cannabis use disorder. Dr. Newring testified that based on his experience and familiarity with juvenile court services, there were programs to provide cognitive behavioral therapy for juveniles and there were a variety of licensed drug and alcohol counselors that could provide treatment services for Nunn's diagnosis of cannabis use disorder. Dr. Newring explained that although DCYC provides counseling services, the focus "is typically on symptom management and maintenance," such as treating anxiety and depression, but that DCYC lacks the staffing to provide counseling focused on therapeutic change. Dr. Newring testified that there are juvenile court programs available to better address those issues and "that [Nunn's] treatment needs to be addressed in the community setting." Further, Dr. Newring's report stated that "for [Nunn's] best interest[s], having this matter adjudicated in the juvenile court provides [Nunn] the opportunity to benefit from the maturational process that occurs in adolescence as well as having the opportunity to derive a corrective benefit from the current adjudication."

### (e) Martena Nunn's Testimony

Martena testified that Nunn was born in August 2009 and acknowledged that Nunn "picks the wrong friends" and makes "bad decisions." She stated that when Nunn was 5 years old, his older brother passed away and, after that, Nunn started getting in more trouble at school and became more aggressive. Martena expressed that she worked with Hins to help Nunn and that she was willing to continue working with Nunn within the juvenile court system.

### 3. DISTRICT COURT'S ORDER

On September 4, 2025, the district court entered a seven-page order denying Nunn's motion to transfer his case to juvenile court. The court found that the State had shown a sound basis to retain Nunn's case in district court. The details of the district court's consideration of the transfer factors contained in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2024) will be provided in our analysis below.

Nunn appeals the denial of his motion to transfer his case to the juvenile court.

### III. ASSIGNMENTS OF ERROR

Nunn's assignments of error, consolidated and restated, are that the district court abused its discretion by (1) misapplying Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2024) and Neb. Rev. Stat.

§ 43-276 (Cum. Supp. 2024) and failing to properly weigh the statutory factors and the presumption favoring transfer, including discounting uncontroverted expert and probation evidence establishing Nunn's amenability to treatment within the juvenile system and the availability of services sufficient to protect public safety and rehabilitate Nunn before age 19; and (2) admitting and relying upon evidence concerning other individuals' crimes and related proceedings and generalized "gang" materials that he contends were irrelevant to Nunn's individualized transfer analysis and were unfairly prejudicial.

## IV. STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. WAS DENIAL OF TRANSFER ABUSE OF DISCRETION?

#### (a) Legal Framework

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, the allegations against Nunn put him within the latter category of juvenile offenders, and the State filed charges against him in the district court.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3).

In the instant case, after Nunn moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

> (a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k)

whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "[T]he burden of proving a sound basis for retention lies with the State." *Id.* at 557, 990 N.W.2d at 926.

### (b) Analysis of District Court's Findings

Nunn contends that the district court abused its discretion in misapplying § 29-1816 and § 43-276 and in failing to properly weigh the statutory factors and the presumption favoring transfer including discounting uncontroverted expert and probation evidence establishing Nunn's amenability to treatment within the juvenile system and the availability of services sufficient to protect public safety and rehabilitate Nunn before age 19. He also contends that the district court abused its discretion in admitting and relying upon extensive evidence concerning other individuals' crimes and proceedings and generalized "gang" materials that were irrelevant to Nunn's individualized transfer analysis under § 43-276 and were unfairly prejudicial.

### (i) Factors Favoring Retention

In its order denying Nunn's motion to transfer, the district court addressed each of the factors contained in Neb. Rev. Stat. § 43-276(1) (Cum. Supp. 2024). While the court did not specifically identify each factor as favoring retention or transfer, we can surmise from the court's analysis that it found the following factors supported retention in the district court.

Under § 43-276(1)(b), whether the alleged offense included violence, the district court found that there was evidence that the alleged offenses included violence because Nunn

participated in an attempted robbery with other individuals. He wore a face mask during the event. Two of the people he was with brandished firearms during the event. He apparently brought a rock with him into the store and slammed the rock repeatedly against a glass covering of a gun case in an attempt to break it. This all occurred in the presence of [the pawn shop's] employees and customers.

Nunn's participation in an offense in which his co-defendants brandished firearms and Nunn's repeated attempts to use a rock to smash a glass case so that he could steal the firearms contained therein was evidence of violence. We agree that this factor supports retention in the district court.

Under § 43-276(1)(c), the motivation for the offense, the district court found that "[p]ossible motivations" for the offenses were for Nunn to obtain firearms for himself and members of the Pratt Street Gang and "to prove himself to members of the gang." Nunn objects to the court's findings regarding the possible motivations for the offenses and states that such determination "was speculative and contrary to the evidence that demonstrated that Nunn was threatened three hours before the attempted robbery by an older influence to participate in the criminal activity or risk receiving a 'violation[.]'" Brief for appellant at 16. However, exhibit 66 includes photos and videos of Nunn casing a pawn shop, discussing plans to rob a gun store, explaining to another juvenile the consequences if he is caught robbing a gun store, and stating that he was going to obtain a gun. This evidence directly contradicts Nunn's proposed explanation that he was coerced by an older individual to commit the offenses within 3 hours of the crimes. This factor weighs in favor of retaining jurisdiction in the district court.

Under § 43-276(1)(d), the age of the juvenile and the ages and circumstances of any others involved in the offense, the court found that Nunn was 15 years old at the time of the alleged crimes; that he was 16 years old at the time of the transfer hearing; that other persons involved in the attempted robbery were 14 years old, 15 years old, and 19 years old; and that all of the individuals had probable ties to the Pratt Street Gang. Given that the juvenile court would have less than 3 years to rehabilitate Nunn, under the circumstances of this case which include escalating conduct despite numerous efforts to rehabilitate him, we find that this factor weighs in favor of retention.

Under § 43-276(1)(e), the previous history of the juvenile, the district court found that Nunn

> was involved in [the] Juvenile Court for five different dockets at the time of this offense. He has been in DCYC on more than one occasion, has been placed at Cedars Youth Services and successfully completed programs there, has been placed on the [H.O.M.E.] program and has worked with a Gang Intervention Officer. The Court notes that once [Nunn] was placed at home after Cedars, probation had a lot of issues tracking his whereabouts. He would sneak out of the home and also cut his GPS ankle monitor off. It was while he was awaiting placement in an intensive outpatient treatment program that he committed the offenses charged in this case.

The record establishes that Nunn has been previously involved in the juvenile court system, failed to abide by the terms of his juvenile probation, absconded from his mother's home, received additional charges while on juvenile probation, and cut off his electronic monitor prior to the commission of the current offense. Given the evidence presented, we cannot say that the district court abused its discretion in finding that this factor weighs in favor of retention in the district court.

Under § 43-276(1)(g), consideration of public safety, the district court found that Nunn's "actions in this matter cause a safety concern for the public in general." Based upon the allegations

associated with the current crime and the record of Nunn's escalating conduct, we agree with the district court that this factor weighs in favor of retention in the district court.

Under § 43-276(1)(h), consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct, the district court noted that it

> specifically received an opinion from [Dr. Newring] that [Nunn's] "ability to understand and appreciate the emotional experiences of others is somewhat limited at present due to some of the narcissistic facets common across adolescents all over the world . . . that [Nunn] is likely to have an improved appreciation of the nature and seriousness of his conduct as he continues to age." Dr. Newring also opined that "the challenge in this area, however, is the music and art [that Nunn] has consumed and at times produced diminish the seriousness of such conduct and may even glorify such conduct." The Court notes that this offense was committed while [Nunn] was already involved with [the] Juvenile Court and therefore it is evidence [Nunn] would understand he is in violation of the law and will face consequences for his actions.

We agree with the district court that the evidence, including Nunn's own statements in messages to others on Instagram, revealed that Nunn was aware of the consequences that he faced by continuing to break the law. This factor supports retention in the district court.

Under § 43-276(1)(i), the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose. Here, the court found that the alleged offenses "posed a great safety risk to the public" and that Nunn might require supervision past the age of 19 due to his juvenile court history and willingness to participate in crimes even while involved in the juvenile court. We note that Nunn argues that "[t]he court erred in discounting uncontroverted evidence of amenability to treatment and the sufficiency of juvenile services to protect public safety within jurisdictional time." Brief for appellant at 19. However, although Dr. Newring and Hins opined that Nunn could benefit from rehabilitative services not yet provided to Nunn, neither testified that Nunn could be rehabilitated prior to reaching the age of majority. We find that when considering the testimony of Hins and Dr. Newring, paired with the violence of Nunn's alleged crimes and history, the escalation of his criminal behavior, his failed attempts at rehabilitation in juvenile probation, and his gang activity, support the district court's conclusion that Nunn requires detention and/or supervision extending into his adulthood.

Under § 43-276(1)(l), whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm, the district court found that Nunn had two stolen firearms on his person at the time of his arrest. Although Nunn acknowledges that Nunn had two guns in his possession at the time of his arrest, he argues that the district court failed to consider that "neither of the guns were loaded, neither of them had ever been fired, neither of them were involved in the instant offense and that Nunn had no involvement in the unlawful procurement of those guns." Brief for appellant at 17. Even if Nunn did not steal the guns found on his person at the time of his arrest, the fact remains that he was in possession of two stolen guns. Clearly, this factor weighs in favor of retention in the district court.

Under § 43-276(1)(n), whether the juvenile is a criminal street gang member, the court found that evidence was presented that Nunn is a member of the Pratt Street gang. Although Nunn argues that he was not a "full-fledged gang member," brief for appellant at 16, we note that in Instagram downloads obtained from the search of Nunn's phone, Nunn admitted that he was a member of the Pratt Street gang. We find that this factor also weighs in favor of retention in the district court.

### (ii) Factors That Do Not Support Sound Basis for Retention

Again, we note that in its order denying Nunn's motion to transfer, although the district court addressed each of the factors contained in § 43-276(1), the court did not specifically identify each factor as not supporting a sound basis for retention but we can surmise from the court's analysis that it found the following factors did not support a sound basis for retention.

Under § 43-276(1)(a), the type of treatment Nunn would be amenable to, the district court found that Nunn "may be amenable to treatment and services offered through the juvenile court including drug treatment, therapy, and out-of-home placement." We agree with the district court that the evidence presented, specifically the testimonies of Hins and Dr. Newring, supported a determination that there were rehabilitative services available to Nunn from which Nunn could benefit. But as we noted before, we found no abuse of discretion with the district court's finding that this rehabilitation would likely extend into Nunn's adulthood. But we consider the fact that Nunn remained amenable to treatment as a factor that does not support retention.

Under § 43-276(1)(f), the best interests of the juvenile, the court found that it was in Nunn's best interests to "discontinue his participation in gang activity and attend school and not use drugs. It is clear he has not done that so far while participating in Juvenile Court Services." Although we acknowledge the truth in the district court's comments, we find that, like any other juvenile, Nunn's long-term interests would be best served with adjudication in the juvenile court rather than facing serious felony charges in the district court.

Under § 43-276(1)(m), whether a juvenile court order had been issued for the juvenile pursuant to Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016) (finding that juvenile is not amenable to rehabilitative services that can be provided under Nebraska Juvenile Code), the court found that such an order had not been issued. Accordingly, this factor does not support retention.

Additionally, the court found that neither party presented any evidence regarding the following factors: § 43-276(1)(j), whether the victim or juvenile agree to participate in restorative justice and § 43-276(1)(k), availability of pretrial diversion; and, under § 43-276(1)(o), such other matters as the parties deem relevant to aid in the decision, the court found that there was no other relevant information to aid in its decision. Given the Supreme Court's directive in *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023), that any factor found not to favor retention should be considered a factor that does not support a sound basis for retention, we find that these factors do not support retention.

### (iii) No Abuse of Discretion

In sum, nine out of the 15 factors set forth in § 43-276(1) support retaining Nunn's case in the district court. The district court properly considered the violence in the alleged offenses, Nunn's unsuccessful history in the juvenile court, and public safety concerns. There is no

arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). There are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025). It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *Id.*

When considering the entire record before us, we cannot say that the district court abused its discretion in denying Nunn's motion to transfer his criminal proceedings to the juvenile court. Although there was evidence presented that Nunn may be amenable to treatment and services offered through the juvenile court, the ultimate test lies in weighing the security of the public in relation to the "practical and nonproblematical rehabilitation" of Nunn. Here, the evidence established that Nunn has demonstrated an unwillingness to participate in juvenile services, he cut off his GPS tracker shortly before the alleged offenses, he committed the alleged offenses while on juvenile probation, and he has exhibited escalating criminal behavior moving from obstructing a peace officer and unauthorized use of a propelled vehicle to the current charges of attempted robbery and two counts of possession of a stolen firearm.

Although Hins testified that services in juvenile court had not been exhausted and Dr. Newring opined that it was in Nunn's best interests to have his case transferred to juvenile court, the evidence presents issues with practical and nonproblematical rehabilitation and casts serious doubts on Nunn's ability to be rehabilitated in the amount of time that Nunn would be subject to the juvenile court's jurisdiction.

As the Supreme Court has recently emphasized, abuse of discretion is a highly deferential standard of review. *State v. Jeremiah T., supra*. In reviewing a trial court's ruling on a transfer motion, an appellate court's function is not to review the record de novo to determine whether we think the case should be transferred. *Id.* An appellate court's review is limited to determining whether the trial court's reasons and rulings are clearly untenable. *Id.* To be "untenable" is to be "incapable of being defended." *Id.* at 152, 21 N.W.3d at 327. In this case, the district court provided a sound basis for retaining jurisdiction. Accordingly, we find no abuse of discretion in the district court's order denying the motion to transfer.

2. ALLEGED ERRONEOUS ADMISSION OF EVIDENCE

Nunn next contends that district court abused its discretion "by admitting and relying upon extensive evidence concerning other individuals' crimes and proceedings, and generalized 'gang' materials, that were irrelevant to Nunn's individualized transfer analysis under § 43-276 and were unfairly prejudicial." He argues that "[t]he reliance on such collateral material was an abuse of discretion because it introduced an improper basis for denying transfer." Brief for appellant at 19.

At hearings on motions to transfer a case from the county court or district court to juvenile court, "[t]he customary rules of evidence shall not be followed at such hearing." Neb. Rev. Stat. § 29-1816(3)(a) (Cum. Supp. 2024). Here, because the district court was not constrained by the customary rules of evidence, we find no abuse by the district court in admitting into evidence and relying upon the evidence objected to by Nunn. And because of Nunn's affiliation with the Pratt Street gang, evidence of gang materials and dealing were relevant to the proceedings.

- 11 -

We further note that when the district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Leroux*, 26 Neb. App. 76, 916 N.W.2d 903 (2018); *State v. Lu*, 33 Neb. App. 45, 10 N.W.3d 382 (2024). Here, independent of the evidence objected to by Nunn, there was ample evidence supporting retention of this case in the district court. Accordingly, this assignment of error fails.

## VI. CONCLUSION

For all the reasons stated above, we affirm the district court's order denying Nunn's motion to transfer his case to the juvenile court.

AFFIRMED.